Filed:  February 17, 1999

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 96-2779(L)
(11-CA-16107, 11-CA-17139)

Beverly Enterprises, etc.,

                                        Petitioner,

        versus

National Labor Relations Board,

                                        Respondent.

O R D E R

        The court amends its opinion filed January 19, 1999, as
follows:

        On page 14 -- the first sentence of the dissent is corrected
to read:  "I dissent in both Nos. 96-2778/97-1037 (<u>Glasgow</u>) and 96-
2779/97-1078 (<u>Carter Hall</u>)."

                                For the Court - By Direction


                                /s/ Patricia S. Connor
                                        Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BEVERLY ENTERPRISES, VIRGINIA,
INCORPORATED, d/b/a Carter Hall
Nursing Home,
Petitioner,

v.

No. 96-2779

NATIONAL LABOR RELATIONS BOARD,
Respondent.

AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL
ORGANIZATIONS (AFL-CIO),
Amicus Curiae.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

BEVERLY ENTERPRISES, VIRGINIA,
INCORPORATED, d/b/a Carter Hall

No. 97-1098

Nursing Home,
Respondent.

AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL
ORGANIZATIONS (AFL-CIO),
Amicus Curiae.

On Petition for Review and Cross-application
for Enforcement of an Order of the
National Labor Relations Board.
(11-CA-16107, 11-CA-17139)

Argued: June 2, 1998

Decided: January 19, 1999

Before WILKINSON, Chief Judge, and WIDENER,
MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON,
LUTTIG, WILLIAMS, MICHAEL, MOTZ, Circuit Judges,
and PHILLIPS, Senior Circuit Judge.

_____

Petition for review granted and cross-application for enforcement
denied by published opinion. Judge Niemeyer wrote the majority
opinion, in which Chief Judge Wilkinson and Judges Widener, Wil-
kins, Hamilton, Luttig, and Williams joined. Senior Judge Phillips
wrote a dissenting opinion, in which Judges Murnaghan, Ervin,
Michael, and Motz joined.

_____

## COUNSEL

**ARGUED:** Andrew Allen Peterson, JACKSON, LEWIS, SCHNITZ-
LER & KRUPMAN, White Plains, New York, for Petitioner. Linda
Jill Dreeben, NATIONAL LABOR RELATIONS BOARD, Washing-
ton, D.C., for Respondent. **ON BRIEF:** James D. Williams, Jr.,
Thomas V. Walsh, JACKSON, LEWIS, SCHNITZLER & KRUP-
MAN, White Plains, New York, for Petitioner. Frederick L. Feinstein,
General Counsel, Linda Sher, Associate General Counsel, Aileen A.
Armstrong, Deputy Associate General Counsel, Joseph A. Oertel,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for
Respondent. Jonathan P. Hiatt, AFL-CIO, Washington, D.C.; David
M. Silberman, Laurence Gold, Washington, D.C., for Amicus Curiae.

_____

## OPINION

NIEMEYER, Circuit Judge:

After Beverly Enterprises, Virginia, Inc., refused to bargain with a
unit certified by the National Labor Relations Board that included

2

licensed practical nurses who were functioning as "charge nurses," the Board found that Beverly Enterprises had committed an unfair labor practice under §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act. Beverly Enterprises filed this petition for review, arguing that the licensed practical nurses were "supervisors" under § 2(11) of the Act and thus were not entitled to organize and bargain collectively pursuant to § 7. Because we hold that these licensed practical nurses are "supervisors" under the Act, we grant Beverly Enterprises' petition and deny the Board's application for enforcement of its order.

I

Beverly Enterprises, Virginia, Inc., operates Carter Hall Nursing Home in Dryden, Virginia, a home which serves 50 patients housed in two wings with 32 and 18 beds, respectively. The top level of management at Carter Hall consists of an Administrator and three registered nurses who hold the positions of Director of Nursing, Assistant Director of Nursing, and RN Supervisor. Direct patient care is provided by six licensed practical nurses ("LPNs") (one of whom is part-time) who function as charge nurses and 21 certified nursing assistants. The Director and Assistant Director of Nursing and the RN Supervisor do not directly supervise the nursing assistants.

The Director and Assistant Director of Nursing work at the nursing home during the first shift (8:00 a.m. to 4:30 p.m.) each weekday and the RN Supervisor works eight hours each day on Saturday and Sunday. During the second and third shifts of each day, the LPN charge nurses are the most senior employees present at the nursing home.

The written job descriptions for LPN charge nurses and certified nursing assistants specify that nursing assistants report to the LPNs and that the LPNs supervise the nursing assistants. In particular, the nursing assistants' job description directs the nursing assistants to adhere "to the instructions issued by the [LPN] charge nurse and nursing department policies and procedures," to "perform[ ] other duties that may be assigned by charge nurse," and to "be able to work under close supervision." Similarly, the job description for the LPNs instructs that they are to develop a plan with team members for the care of the patients assigned to the team, "to direct and supervise the number of the nursing team carrying out the plan," and to establish

3

procedures whereby the team "continuously evaluates and revises the plan to meet changing needs of the patients." The job description assigns to LPNs the responsibility for supervising nursing assistants, assigning them nursing care tasks, teaching them nursing procedures, and, when the Administrator and Director of Nursing are absent from the facility, "tak[ing] action necessary for continued operation of the nursing home."

Consistent with these written job descriptions, the LPNs at Carter Hall assign the nursing assistants to particular patients and direct their work. While the Director and Assistant Director of Nursing formulate an overall work schedule that outlines the services to be provided to each patient, the LPNs implement the schedule and direct "everything that happens on the unit." Based on the LPNs' knowledge of the nursing assistants' skills, experience, and personalities, the LPNs match the nursing assistants with the patients, filling out daily assignment sheets and adjusting them as needed. The LPNs monitor the nursing assistants' break time and adjust breaks as needed, and they allow nursing assistants to go home early when sick. In those circumstances, the LPNs may procure replacements as necessary, but they may not discipline a replacement who refuses to show up.

While LPN charge nurses are not authorized to directly discipline nursing assistants for not coming to work or for other work infractions, the LPNs do have authority to send them home for misbehavior. In addition, the LPNs provide input for disciplinary decisions made by the Director and Assistant Director of Nursing and are authorized to "write up" nursing assistants. While this authority has only been used sporadically, in at least one situation, an LPN charge nurse sent a nursing assistant home for misbehavior and, solely on the recommendation of the LPN, that nursing assistant was discharged.

For two-thirds of the time during any given week, the LPN charge nurses are the most senior representatives of Beverly Enterprises present at Carter Hall and, during that period, they are authorized to ensure the continued operation of the nursing home in a proper manner. Thus, in cases of emergency or disaster, the LPNs are authorized to order the evacuation of the home and to direct the plan of evacuation.

4

On January 21, 1993, the United Mine Workers of America (the "Union") petitioned the National Labor Relations Board (the "NLRB" or the "Board") to hold a representational election to allow the Union to represent a unit of approximately 40 non-supervisory employees at Carter Hall, including the six LPN charge nurses. Beverly Enterprises contested the inclusion of its LPNs in the unit, but the Regional Director concluded, following a hearing, that the LPN charge nurses were covered employees and not supervisors, thus including them in the potential bargaining unit. In his findings, the Regional Director acknowledged the various responsibilities given to the LPN charge nurses, but he acted on the Board's "reticen[ce] to find such care-givers to be supervisors":

> The Board has carefully avoided applying a definition of "supervisor" to a health care professional who gives direction to other employees in the exercise of professional judgment, which direction is incidental to the professional's treatment of patients, and thus is not the exercise of supervisory authority in the interest of the Employer.

(quoting St. Mary's Infant Home, 258 NLRB 1024, 1039 (1981)).

Following an election, which the Union won, the Board certified the unit. The Union then attempted to bargain with Beverly Enterprises, but Beverly Enterprises refused. Shortly thereafter, the Supreme Court handed down its decision in NLRB v. Health Care & Retirement Corp. of America, 511 U.S. 571 (1994), which rejected the analysis upon which the NLRB had relied to decide the employment status of the LPNs at Carter Hall. Accordingly, the Board allowed the Regional Director to reconsider his decision. The Regional Director issued a supplemental decision which reached the same outcome as his previous decision, but on different grounds. The Regional Director evaluated a few, but not all, of the responsibilities assigned to LPN charge nurses at Carter Hall and then concluded summarily that the LPNs' functions were "routine and essentially clerical [in] nature" and therefore did not satisfy the requirements of 29 U.S.C. § 152(11) (defining the meaning of "supervisor").

Through a separate proceeding, the Board ordered Beverly Enterprises to begin bargaining with the Union and, upon Beverly Enter-

5

prises' refusal, found that Beverly Enterprises committed an unfair labor practice in violation of 29 U.S.C. § 158(a)(1) (prohibiting employers from interfering with employees' exercise of rights under the NLRA) and § 158(a)(5) (requiring employers to bargain with certified representatives).

On appeal from the Board's order, a divided panel of this court granted the Board's petition for enforcement, holding that Beverly Enterprises' LPNs were not supervisors under the National Labor Relations Act. See Beverly Enterprises, Virginia, Inc. v. NLRB, 136 F.3d 361 (4th Cir. 1998) (per curiam). By order dated March 30, 1998, the full court vacated that panel opinion and ordered that the case be reheard en banc.

II

While the National Labor Relations Act ("NLRA") grants "employees" the right to self-organize and bargain collectively, see 29 U.S.C. § 157; Hanna Mining Co. v. Marine Eng'rs Beneficial Ass'n, 382 U.S. 181, 188 n.11 (1965), the Act's coverage does not apply to "any individual employed as a supervisor," 29 U.S.C.§ 152(3). Accordingly, supervisors may not be certified as part of a collective bargaining unit.

The Act defines "supervisor" to mean:

> [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). Thus, in order to qualify as a supervisor under the NLRA, an employee must meet three criteria: (1) she must be authorized to perform or recommend at least one of the twelve duties enumerated in § 152(11); (2) her authority must promote the interest

6

of the employer; and (3) the exercise of her authority must require the use of independent judgment. <u>See</u>, <u>e.g.</u>, <u>NLRB v. Health Care & Retirement Corp. of America</u>, 511 U.S. 571, 573-74 (1994); <u>Glenmark Assocs., Inc. v. NLRB</u>, ___ F.3d ___, 1998 WL 324522, at *5 (4th Cir. June 19, 1998).

To find that an employee has satisfied the first prong of this test, a factfinder need only find that the employee has the authority to perform <u>any single one</u> of the twelve enumerated duties. <u>See</u>, <u>e.g.</u>, <u>NLRB v. St. Mary's Home, Inc.</u>, 690 F.2d 1062, 1065 (4th Cir. 1982); <u>Monongahela Power Co. v. NLRB</u>, 657 F.2d 608, 612 (4th Cir. 1981). And the employee need not actually perform an enumerated duty to satisfy the first prong so long as the employee has the authority to do so, "for it is the power and not the frequency of its use which is dispositive." <u>St. Mary's Home</u>, 690 F.2d at 1068; <u>see also NLRB v. Tio Pepe, Inc.</u>, 629 F.2d 964, 969 (4th Cir. 1980).

To meet the second prong of the test, that an employee's authority promote the interest of the employer, the authority given to the employee must be exercisable "within the scope of employment or on the authorized business of the employer." <u>Health Care</u>, 511 U.S. at 578 (citation omitted). In the context of a nursing home, it thus is apparent that simply because a nurse acts to care for patients does not preclude a finding that the nurse is working in the interest of the employer. <u>See id.</u> at 579-80.

And finally, to meet the third prong, authority must be exercised with "independent judgment," meaning that it must be exercised in a non-ministerial way to achieve management goals. The Court made clear in <u>Health Care</u> that the use of independent judgment is distinct from a mere exercise of professional expertise. Thus, when an employer grants to an employee the authority to use judgment in the management or evaluation of other employees, that judgment is independent judgment under the NLRA, not the exercise of professional expertise. <u>See Glenmark</u>, ___ F.3d at ___, 1998 WL 324522, at *6 (quoting <u>Health Care</u>, 511 U.S. at 583); <u>see also Passavant Retirement & Health Ctr. v. NLRB</u>, ___ F.3d ___, 1998 WL 416905, at *6 (3d Cir. July 24, 1998).

In applying the definition of supervisor in 29 U.S.C. § 152(11), the Board has, we believe, manifested an irrational inconsistency. In ear-

7

lier interpretations of § 152(11), the Board read the statutory defini-
tion of supervisor to include an LPN who is the most senior employee
on the job site during the night shift and who has authority to assign
certain duties to nurses aides and effectively to recommend their dis-
charge. Thus, in National Living Ctrs. Inc., 193 NLRB 638 (1971),
the Board noted:

> Moody is the only L[P]N working the night shift, and is
> clearly responsible for seeing that the work on this shift is
> performed as required. As pointed out, if Moody is not a
> supervisor then one must conclude that the entire nursing
> home and its many patients are left without any direct super-
> vision during the night hours, and this is not the case.
> Moody assigns certain duties to the three or four nurses
> aides on her shift, and checks the patients rendering the ser-
> vices an L[P]N is capable of giving. She has the authority
> to, and does, grant time off, and she also effectively recom-
> mends discharges and transfers to other shifts.

Id. at 639; see also Pine Manor Nursing Ctr., 270 NLRB 1008, 1009
(1984) (relying principally on LPNs' effective authority to recom-
mend nurses aides for termination, retention, and merit-based wage
increases to find the LPNs to be supervisors); Avon Convalescent
Ctr., Inc., 200 NLRB 702, 705 (1972) (relying principally on LPNs'
authority to give nurses aides "directions, work orders and assign-
ments" to find LPNs supervisors); University Nursing Home, Inc.,
168 NLRB 263, 265 (1967) (relying on LPN's supervision of three
nurses aides in performance of tasks for patients and review of
patients' charts to ensure that physicians' instructions are followed to
find the LPN a supervisor). As recently as 1993, the Board found that
LPNs exercised independent judgment and therefore were supervisors
when they evaluated nurses aides and furnished the evaluations to
their employer to provide a basis for the nurses aides' merit raises and
departmental bonuses. See Bayou Manor Health Ctr., Inc., 311 NLRB
955, 955 (1993).

Yet later that same year, when considering a factual circumstance
similar to those in these other cases, the Board concluded that LPNs,
even though they exercised some independent judgment, were never-
theless not supervisors because the judgment they exercised was for

8

the benefit of the patients and therefore not for the benefit of the employer. <u>See Beverly Enterprises, Ohio, Inc.</u>, 313 NLRB 491 (1993). Rather than follow its precedents established in the earlier cases, the Board concluded that the LPNs were not supervisors because the exercise of independent judgment was "for the most part given as an extension of the nurses' professional or technical judgment in the interest of providing sound patient care." <u>Id.</u> at 505. Such judgment, the Board held, was not the exercise of supervisory authority "in the interest of the employer." <u>Id.</u>

After the Supreme Court in <u>Health Care</u> rejected the NLRB's rule that nurses acting in the interests of their patients were not acting in the interests of their employers, the NLRB crafted a new approach to the status of LPNs using different language to reach the same substantive outcome. <u>See</u>, <u>e.g.</u>, <u>Providence Hosp. and Alaska Nurses' Ass'n</u>, 320 NLRB 717 (1996); <u>Nymed, Inc.</u>, 320 NLRB 806 (1996). Under this new approach, the Board concluded that charge nurses are non-supervisory employees even when they possess the authority to assign employees work tasks based on their skills, the authority to decide when more health care workers need to come to work, the authority to let staff off work early, the authority to evaluate other workers, and the authority to coordinate patient care within a unit -- all because these types of authority were found to be lacking independent judgment. <u>See Providence Hosp.</u>, 320 NLRB at 730-32; <u>Nymed</u>, 320 NLRB at 810-13. This conclusion is diametrically opposed to the Board's earlier position that LPNs with such authority -- indeed, with even less authority -- exercised independent judgment. Thus, rather than return to its original reading of 29 U.S.C. § 152(11) that LPNs with the authority to assign work, to assign nurses aides to tasks, and effectively to recommend discipline are supervisors, the Board has now adopted the position that LPNs are not supervisors even though: they are the highest-ranking employees at a nursing home for two-thirds of the time; they assign and direct nurses aides; they are authorized to send nurses aides home in aggravated circumstances; and they effectively recommend discipline. What promoted this shift from its earlier position is unclear. <u>Compare National Living Ctrs.</u>, 193 NLRB at 639. But it has prompted widespread speculation that the Board's decisions on this subject are based not on the three-pronged test of the Act but on a "policy bias."

9

In Glenmark, we noted: "We are not the first court to wonder whether this new interpretation is an end run around an unfavorable Supreme Court decision in order to provide policies of broadening the coverage of the Act, maximizing the number of unions certified, and increasing the number of unfair labor practice findings it makes." Glenmark, ___ F.3d at ___ n.8, 1998 WL 324522, at *6. And in Caremore, Inc. v. NLRB, 129 F.3d 365 (6th Cir. 1997), a case involving facts and issues nearly identical to ours, the Sixth Circuit noted, in reversing the Board, that the case there was not close, id. at 370, and admonished the Board not to follow its unjustified position that "supervisory status is almost never to be accorded nurses whose supervisory authority is exercised over less-skilled professionals in the interest of patient care," id. at 371. Indeed, in Health Care, the Supreme Court observed that because of the inconsistency of the Board's interpretations with the statutory language and Supreme Court precedent, the Board "seeks to shift ground, putting forth a series of [unpersuasive] nonstatutory arguments." 511 U.S. at 580. And even before the decision in Health Care, we had noted a peculiarity in the Board's litigating position. In St. Mary's Home, we observed that the Board's position on who constituted a supervisor was so manifestly inconsistent that one commentator "aptly observed" that the Board was displaying an "institutional or policy bias." 690 F.2d at 1067.

While the NLRB's application of the Act over which it is given charge is entitled to deference, the Board's legal positions must nonetheless be rational and consistent with the Act. See Health Care, 511 U.S. at 576; NLRB v. Yeshiva Univ., 444 U.S. 672, 691 (1980). And at bottom "[i]t is the function of the courts. . . to say what an enacted statute means." Health Care, id. at 582 (quoting Pierce v. Underwood, 487 U.S. 552, 566 (1988)). The determination of whether a given set of facts fulfills the statutory criteria poses the legal question of what the statute means.

III

Turning now to the circumstances before us, we must determine whether the facts of record fulfill the statutory requirements of "supervisor" (1) that the Carter Hall LPNs be authorized to perform or recommend any of the twelve duties enumerated in 29 U.S.C.

10

§ 152(11), (2) that in performing or recommending any of these duties, they act in the interest of their employer, and (3) that the exercise of authority require the use of independent judgment.

First, it is clear from the record that Carter Hall LPNs perform several of the duties itemized in § 152(11). LPN charge nurses at Carter Hall indisputably have the ability and responsibility to assign and direct the 21 nursing assistants as well as to send them home if necessary and effectively to recommend their suspension or discharge. Charge nurses have the authority to assign nursing assistants to work tasks and to assign and reassign them to particular wings and patients. They also fill out daily assignment sheets for the nursing assistants that instruct the nursing assistants about the work they need to accomplish over the course of a day. Although the LPNs may not alter a nursing assistant's job classification, they have complete authority to assign the work that is performed by the nursing assistants. Indeed, the very job description of the charge nurse recognizes the LPNs' authority to "[a]ssign[ ] the nursing care to the patient to be given by others, utilizing the skill of the personnel to the maximum benefit of the patient."

In addition to making work assignments, the LPN charge nurses have the authority responsibly to direct nursing assistants in their work on a daily basis. Besides directing nursing assistants in their work tasks and assignments, charge nurses are "responsible for everything that happens on the unit." The charge nurse may alter and monitor nursing assistants' break times, may decide when a nursing assistant may go home early, may adjust nursing assistants' work schedules to ensure that necessary work is completed, and may decide when it is necessary to call in a replacement nursing assistant. In the case of an emergency, a charge nurse may order an evacuation of the nursing home and direct that evacuation. Furthermore, at all hours when a registered nurse is not on duty -- virtually two-thirds of the time -- "the Charge Nurse is authorized to take action necessary for continued operation of the nursing home."

In addition, there is undisputed evidence in the record that charge nurses have the authority to send nursing assistants home for misbehavior and effectively to recommend their discharge -- to "write up" nursing assistants. Indeed, this authority has been used in its most dra-

11

matic form in at least one instance when a charge nurse suspended a nursing assistant -- without any guidance from upper management -- and then effectively recommended that nursing assistant's discharge. The decision to terminate this employee "was based totally on the information that the Charge Nurse gave us about the incident and her recommendations." The mere fact that this authority exists compels a finding that Carter Hall charge nurses undertake§ 152(11) enumerated duties, even if this authority is only used on occasion. See St. Mary's Home, 690 F.2d at 1068; Tio Pepe, 629 F.2d at 969.

As for the second prong of the supervisor status test, the charge nurses' enumerated § 152(11) duties are, under Health Care, indisputably undertaken in the interest of the charge nurses' employer. "Patient care is the business of a nursing home, and it follows that attending to the needs of the nursing home patients, who are the employer's customers, is in the interest of the employer." Health Care, 511 U.S. at 577. The direction, assignment, and discipline of nursing assistants are management decisions made in the interest of Beverly Enterprises, and when the Carter Hall charge nurses exercise their authority to make these decisions, they act in Beverly Enterprises' interest.

It is the third prong of the § 152(11) test-- whether the charge nurses exercise independent judgment -- on which the Board relies in this case to argue that LPNs are not supervisors. Although the Board acknowledges that Carter Hall charge nurses direct and assign work to nursing assistants, it argues that they"do so only in a `routine manner' without utilizing `independent judgment.'" The record, however, does not support this position.

To begin with, almost two-thirds of the time that Beverly Enterprises operates Carter Hall -- 15 1/2 hours a day on weekdays and 16 hours a day on weekends -- LPN charge nurses are the most senior staff at Carter Hall. During this time, they are authorized "to take action necessary for continued operation of the nursing home." It strains credulity to imagine that for two-thirds of the operating time of the nursing home, no judgments other than routine and clerical judgments are made to keep the home operating. See Glenmark, ___ F.3d at ___, 1998 WL 324522, at *8; see also National Living Ctrs., 193 NLRB at 639 (where the Board made the same observation under

12

its earlier position). During this time, LPNs are faced with an array of decisions that require independent judgment. Among other responsibilities, they are required to decide which nursing assistants work where, which nursing assistants are to provide treatment for which patients, whether a nursing assistant's misbehavior warrants sending the nursing assistant home, and whether exigent circumstances require an evacuation of the nursing home. These are not the decisions of a mere "night watchman." To the contrary, such decisions, made without guidance from upper management, clearly require judgment that is "sensitive and nuanced," and much more than ministerial. See Caremore, 129 F.3d at 370.

Moreover, these judgments are by and large made without any guidelines or established criteria. As the Board concedes, Beverly Enterprises provides no list of criteria by which assignments, direction of nursing assistants, or emergency dismissals are to be made. LPN charge nurses are thus "responsible for everything that happens on the unit" without having any guidelines to instruct them how to undertake that responsibility. The reason such guidelines are absent is clear -- the charge nurses have the authority to undertake their duties using their independent judgment.

Furthermore, contrary to the position taken by the Board, the decisions that the charge nurses make are management decisions, not ones related solely to a nurse's professional expertise. The Board would collapse the distinction between management prerogatives and professional knowledge. But the assignment of work, direction of nursing assistants, discipline of nursing assistants, and similar duties are not simply professional medical functions. Rather, such decisions are part and parcel of what it means to be a manager and a supervisor. Every assignment of work requires some level of expertise, but supervisors need not be ignorant of the work situation which they supervise to fall within the § 152(11) definition of "supervisor." Rather, certain types of decisional authority, regardless of the manager's professional knowledge, make one a supervisor under the NLRA.

In this case, the Carter Hall LPNs have the authority to run the home in the absence of other management. They assign tasks to personnel and personnel to tasks and work locations. They regulate tasks and work-breaks as well as direct the nursing assistants in the comple-

13

tion of their work in an entirely discretionary manner. They are even authorized to transfer nursing assistants to different wings of the nursing home at their discretion, and they are authorized to send a nursing assistant home for misbehavior without the approval of other management. Finally, they can declare and direct an evacuation when they deem the circumstances warrant it. Such decisions, by their very nature, make one a supervisor under the NLRA.

In so holding, we continue in line with our precedents in Glenmark and St. Mary's Home, and we note our circuit's agreement with the general approach taken on this issue by the Third and Sixth Circuits. See Passavant Retirement & Health Ctr. v. NLRB, ___ F.3d at ___, 1998 WL 416905, at *6 (3d Cir. July 24, 1998); Mid-America Care Found. v. NLRB, ___ F.3d at ___, 1998 WL 374748, at *3 (6th Cir. July 8, 1998); Caremore, 129 F.3d at 368-71. Although we reach a different result than that reached in somewhat similar circumstances by the D.C., Eighth, and Ninth Circuits, see Beverly Enterprises, Minnesota, Inc. v. NLRB, ___ F.3d at ___, 1998 WL 385917, at *4-7 (8th Cir. July 13, 1998); Beverly Enterprises, Pennsylvania, Inc. v. NLRB, 129 F.3d 1269, 1270-71 (D.C. Cir. 1997); Providence Alaska Med. Ctr. v. NLRB, 121 F.3d 548, 552-55 (9th Cir. 1997), we note that the legal determination of whether an LPN is a supervisor depends of necessity on the underlying facts. To the extent that these circuits reach a different conclusion on the statutory meaning of independent judgment, however, we decline to follow their approach.

Accordingly, Beverly Enterprises' petition for review is granted and the NLRB's decision is reversed. The NLRB's application for enforcement of its order is denied.

IT IS SO ORDERED.

PHILLIPS, Senior Circuit Judge, dissenting:

I dissent in both Nos. 96-2778/97-1037 (Glasgow) and 96-2779/97-1078 (Carter Hall). I would enforce the Board's orders and deny the petitions for review in both of these cases essentially for the reasons given in Judge Hall's majority opinions in the two vacated panel decisions. See Beverly Enters., W. Va., Inc. v. NLRB, 136 F.3d 353 (4th Cir. 1998) (hereinafter Glasgow); Beverly Enters., Va., Inc. v. NLRB, 136 F.3d 361 (4th Cir. 1998) (hereinafter

14

Carter Hall). As those opinions cogently demonstrate, the Board's decisions, properly reviewed, are supported by substantial evidence and are not contrary to law.

The en banc majority's contrary conclusion is reached by failing to accord the judicial deference owed both to the Board's construction of the enigmatic "independent judgment" element of the famously ambiguous statutory definition of "supervisor" and to the Board's findings of fact in application of that construction. Instead, as I will later demonstrate, the majority effectively conducts de novo review of the Board's decisions, first adopting its own legal construction of the critical independent judgment requirement, then applying it in plenary review of the evidence to conclude that the LPN charge-nurses in these cases were "supervisors" under § 2(11) of the Act.

I do not believe that any licence so to skew normal standards of judicial review in these cases properly can be found in the justifications upon which the majority seems to rely. That being so, the normal standards apply, requiring that deference be accorded both to the Board's construction of "independent judgment" as a reasonable, not arbitrary, one and to its findings of fact made in application of that construction as plausible ones. If that be done, the Board's decisions that these LPNs are not supervisors were supported by substantial evidence on the record considered as a whole and were not contrary to law. I would so hold.

I

The real issue in these and comparable LPN-as-supervisor cases around the circuits concerns the Board's construction of the "independent judgment" requirement rather than its raw fact-finding processes in deciding these cases. For if the Board's construction is upheld as one owed deference, its findings in application--that the limited authority exercised (or had) by LPNs over CNAs in these cases did not involve the use of "independent judgment"--are unassailable. And, conversely, if the majority's different construction in disregard of the Board's is applied, its contrary conclusion that independent judgment was involved, is equally unassailable. **1** I therefore address

_____

**1** That this issue is the decisive one is readily demonstrated by considering the decisions giving rise to the current post-Health Care circuit con-

15

the Board's construction and the deference we owe it as effectively dispositive of these cases.**2**

Consider the daunting problem of statutory construction that always has faced the Board in giving legal meaning to the term "supervisor" for application in these cases. It is a"tough nut" as Judge Hall pithily put it in the now-vacated panel decision in Glasgow. Glasgow, 136 F.3d at 359. It begins with Congress's own understandable difficulty in defining "supervisor" when, in 1947, it took that category of "employee" out of the organizational, representational, and bargaining protections of the Act. The inevitably ambiguous definition that emerged as § 2(11) of the Act is one that from the outset has defied easy administrative and judicial construction and application.

_____

flict on the question of LPN "independent judgment," hence "supervisor" status. As noted by the en banc majority, these decisions include on one side this court's decision in Glenmark Assocs., Inc. v. NLRB, 147 F.3d 333 (4th Cir. 1998), that of the Third Circuit in Passavant Retirement & Health Center v. NLRB, 149 F.3d 243 (3d Cir. 1998), and of the Sixth Circuit in Mid-America Care Foundation v. NLRB , 148 F.3d 638 (6th Cir. 1998), all rejecting Board determinations that LPNs were not supervisors because they did not exercise independent judgment; and, on the other side, the decisions of the D.C. Circuit in Beverly Enterprises-Pennsylvania, Inc. v. NLRB, 129 F.3d 1269 (D.C. Cir. 1997), of the Eighth Circuit in Beverly Enterprises v. NLRB , 148 F.3d 1042 (8th Cir. 1998), and of the Ninth Circuit in Providence Alaska Medical Center v. NLRB, 121 F.3d 548 (9th Cir. 1997), all upholding similar Board determinations. While inevitably there are factual distinctions between the LPN activities vis-a-vis CNAs in these cases, there is a sufficiently common pattern respecting their assignment, directive, and disciplinary activities that makes it obvious that the different results turn not on any significant factual differences, but on the way"independent judgment" is construed and back of that, on the judicial deference owed the Board's construction. That this is the actual source of the current circuit split seems to be tacitly recognized by the en banc majority. (See Maj. Op. in Carter Hall at 14.)

**2** Which is to say that if that construction is applied, the evidence clearly supports the Board's decisions, as is demonstrated by Judge Hall's evidence assessment in the two vacated panel opinions--which I adopt by reference. See Glasgow, 136 F.3d at 359-60; Carter Hall, 136 F.3d at 362-63.

16

A supervisor is

> any individual having authority, in the interest of the
> employer, to hire, transfer, suspend, lay off, recall, promote,
> discharge, assign, reward or discipline other employees or
> responsibly to direct them, or to adjust their grievances, or
> effectively to recommend such action, if in connection with
> the foregoing the exercise of such authority is not of a
> merely routine or clerical nature, but requires the use of
> independent judgment.

29 U.S.C. § 152(11).

From this bare text it is not possible to say with confidence much
more than the obvious: that to be a "supervisor" (1) an employee must
have the authority to do at least one of the twelve statutorily enumer-
ated activities vis-a-vis other employees; (2) that the authority to do
so must be held "in the interest of the employer" and (3) that the
authority must be such that its exercise is not of a "merely routine or
clerical nature" but "requires the use of independent judgment." See
NLRB v. Health Care & Retirement Corp. of Am., 511 U.S. 571, 573-
74 (1994) (so parsing the statutory language). The first requirement--
that authority exists--presents no problem of construction (nor, usu-
ally, of application). But the meaning of the additional requirements
that the authority be held in the "interest of the employer" and that it
be such that its exercise requires the use of "independent judgment"
as opposed to being of a "merely routine or clerical nature" surely is
far from plain. What delegated authority from an employer to do any-
thing concerning its business is not presumptively "in the interest of
the employer"--to some extent at least? How "independent" must be
the judgment used in exercising authority over fellow-employees to
make its exercise "not merely routine or clerical in nature?" May not
"routine" and "clerical" activities themselves sometimes require the
use of "independent judgment;" are these inveterate opposites? And
so on.

Confronted with this basic ambiguity in the Act's definition of "su-
pervisor," the Board (and reviewing courts) properly have sought
guidance in relevant legislative history. Doing so, they properly have
recognized that Congress's principal definitional concern was at the

17

margins of supervisory authority: with differentiating the lowest level of true supervisors such as foremen--undoubted members of management--from their near-relation, the "straw-boss" or "leadman" who, though frequently exercising delegated authority to direct and assign fellow employees, was as a practical matter not a part of management but just another member of the work force. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 280-81 (1974) (citing S. Rep. No. 89-105, at 4 (1947), as so indicating legislative intent). Accepting this indication of Congress's basic policy concern, the Supreme Court early on recognized its implication that the Board need not consider every employee who performed some "minor supervisory duties" to be a § 2(11) "supervisor." See id. at 274-90; see also Marine Eng'rs Beneficial Ass'n v. Interlake Steamship Co., 370 U.S. 173, 179 n.6 (1962) (agreeing that "gradations of authority" to direct work of others in work force were so "infinite and subtle" that Board must have a "large measure of . . . discretion" in determining who in exercising such authority was and was not a § 2(11) supervisor) (quoting NLRB v. Swift & Co., 292 F.2d 561, 563 (1st Cir. 1961)).

Adding to the intrinsic difficulty posed by § 2(11)'s ambiguous definition of "supervisor" is the contemporaneous amendment respecting "professional" employees, such as the LPNs in our cases. At the same time that Congress defined and excluded"supervisors" from the Act's protections in § 2(11), it defined for continued inclusion "professional" employees. See 29 U.S.C. § 152(12) (definitional section); id. § 159(b) (limiting Board's discretion to include professional and non-professional employees in same bargaining unit). Critically, in defining "professional employee" Congress identified as one of his hallmarks that he "engage[s] in work. . . involving the consistent exercise of discretion and judgment in its performance[.]" Id. § 152(12) (emphasis added). Inescapably, this§ 2(12) definition of the included professional juxtaposed with the § 2(11) definition of the excluded supervisor gave rise to a "tension" between the two that further exacerbated the problem of construing § 2(11). See NLRB v. Yeshiva Univ., 444 U.S. 672, 686 (1980) (so recognizing). Although the Supreme Court has rejected the contention that this "tension" requires that professional employees be distinguished from other employees "for purposes of the definition of supervisor," see Health Care, 511 U.S. at 581, the tension nevertheless remains to challenge the Board and reviewing courts in construing § 2(11). The reality

18

remains that professional employees' "consistent exercise of discretion and judgment in [the] performance of[their work]," 29 U.S.C. § 152(12), invariably will include the exercise of authority to "assign" and "responsibly . . . direct" the activities of those less-skilled employees who traditionally act as "elbow assistants" in performing professionals' assigned work. See NLRB v. Res-Care, Inc., 705 F.2d 1461, 1465 (7th Cir. 1983) (Posner, J.) (citing as examples the lawyer's secretary, the teacher's aide, the doctor's nurse, and the nurse's aide). And, it remains inescapable that unless such professional employees are nevertheless not considered on that account alone to be supervisors under the § 2(11) definition, then Congress's intent categorically to include them in the Act's protections will be effectively undercut.

Seeking to accommodate the definitional tension, the Board first thought the answer could properly be found in § 2(11)'s "interest of the employer" requirement. In the specific context of LPNs exercise of assignment and work direction authority over CNAs, the Board took the adjudicative position that "a nurse's direction of less-skilled employees, in the exercise of professional judgment incidental to the treatment of patients, is not authority exercised`in the interest of the employer.'" See Health Care, 511 U.S. at 574 (so characterizing Board's adjudicative position). Rather, the Board ruled, in affirming an ALJ's decision, that in giving this sort of direction, the LPNs' supervisory activities did not "equate to responsibly . . . direct[ing] the aides in the interest of the employer," their"focus" instead being "on the well-being of the residents rather than of the employer." Id. at 575 (quotation and emphasis omitted). In Health Care, the Supreme Court rejected this construction, holding that it was based upon a "false dichotomy" between acts taken in employer interests and acts taken in patient interests. See id. at 577.**3**

_____

**3** One may wonder whether the "dichotomy" identified by the Court reflected the Board's actually intended adjudicative position. The Court interpreted the Board's position as an either/or proposition: one either acts in the employer's interest or in the customer/client/patient's interest. That is not only a "false" dichotomy but so clear a loser that it is difficult to believe it was what the Board actually intended. Nevertheless, it is what the Court (understandably) perceived. Perhaps, as its later adjudicative positions seem to suggest, the Board's intended distinction was

19

Rebuffed in its "interest of the employer" construction, the Board remained persuaded that in faithfulness to underlying congressional policy as reflected in relevant provisions of the Act and legislative history "supervisor" must be construed in a way that did not categorically exclude LPNs from the Act's protections by virtue of their typical oversight activities in relation to CNAs. And, it properly understood Health Care not to preclude construction of other parts of § 2(11) that would have that effect. See Health Care, 511 U.S. at 583-84 (noting that decision concerned only "interest of the employer" requirement).

Accordingly, in these and comparable post-Health Care LPN-as-supervisor cases around the circuits, the Board now has taken the alternative adjudicative position that the supervisory authority typically exercised by LPNs over CNAs is not exercised with "independent judgment" as contemplated by § 2(11). Specifically, the Board has taken the position that the judgment exercised by LPNs in exercising their incidental[4] supervisory authority over CNAs is not the "independent judgment" concerned with management prerogatives that is contemplated by § 2(11), but is more properly viewed as "professional judgment" exercised in getting their assigned work done with the assistance of CNAs employed specifically for that purpose. Obviously (though not always expressly) applying such a construction of the term, the Board in recent cases consistently has upheld ALJ

_____

between supervisory activities aimed simply at getting the health care job done in ways not inimical to basic labor-relations interests of the CNAs, and supervisory activities involving basic "management prerogatives" likely to be at odds with CNA interests, i.e. , "in the employer's interest" as opposed to theirs.

I mention this only as it may bear upon the rationality of the Board's various efforts to construe, as a matter of delegated policy choice, this and other ambiguous elements of the § 2(11) definition of "supervisor."

[4] In the typical pattern of LPN charge-nurse activities revealed in these cases, they spend the vast majority of their time on duty doing exactly what the CNAs do--directly attending to patients' basic medical and personal hygiene needs. (See J.A. 179 (Decision and Direction of Election in Carter Hall) ("85% of their workday"); id. at 462 (Decision and Direction of Election in Glasgow) ("significant amount of their time").)

20

findings that the traditional pattern of LPN charge-nurse supervisory activities vis-a-vis CNAs exemplified in Glasgow and Carter Hall fall on the "routine or clerical" side rather than the "independent judgment" side. See supra note 1 (citing cases). As indicated, it is unassailable that if that construction is a valid one, the Board's findings in applying it in these cases must be upheld as supported by substantial evidence.

We owe that construction deference unless we can declare it "arbitrary [or] capricious" within the meaning of the Administrative Procedure Act ("APA"). See 5 U.S.C. § 706. And, more particularly, we owe it deference as a classic example of agency construction of an ambiguous provision, see Health Care, 511 U.S. at 579 (so characterizing "independent judgment"), of a statute with whose enforcement the agency is entrusted, unless we cannot say of it even that it is a "permissible construction." Chevron USA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).**5**

I do not see how the Board's construction and application of the term in these cases possibly could be declared "arbitrary [or] capricious," even were we to think it wrong-headed, or misguided, or bad statutory "interpretation," or the like. On the contrary, I am satisfied that it is easily a "permissible construction" of a definitional provision whose ambiguity--overall and in particular--bespeaks Congress's deliberate delegation to the Board of a wide range of discretion in making the difficult policy choices required to differentiate "employees" from "supervisors" at the margins in particular work-forces. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (admonishing that reviewing "court[s] may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo").

The LPN charge-nurse of the pattern revealed in these cases is precisely in that marginal area. Her principal activity--the direct, hands-

_____

**5** The Board's statutory construction by adjudication is entitled, where otherwise due, to Chevron-deference. See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 574 (1988).

21

on care of medical patients--is the end-product of her employer's business. She does everything in the final delivery of that product that anyone in the work-force does. In that respect she is quintessentially just a member of the work-force gang--as surely as if she were on the final assembly line in a widget-producing factory.

She falls in the marginal area only because she does not act alone in the final delivery of the product. CNAs assist her in that effort, and she has and exercises some authority in assigning, directing, and monitoring their performance in giving the "aid" to her that is their function. She therefore does have some supervisory authority, and though this alone does not make her a § 2(11) supervisor, see Bell Aerospace Co., 416 U.S. at 279-83, it must of course be taken into account in determining whether she is.

Finally, there is the fact that in both her primary work activity and her incidental supervisory activity, the LPN charge-nurse functions as a "professional." This does not prevent her being found a § 2(11) supervisor nor even require that a different test of supervisor status be applied to her under § 2(11), see Health Care, 511 U.S. at 581. But, it does require that Congress's express direction that professional employees remain under the Act's organizational protections notwithstanding their "consistent exercise of discretion and judgment in [performing their work]" be also taken into account.

Given the marginal nature of the LPN charge-nurse's primary work activity and incidental supervisory function in the classic pattern of these cases, the Board's construction of "independent judgment" for application to them cannot be declared "arbitrary[or] capricious" under the APA. See 5 U.S.C. § 706. On the contrary, it is an eminently permissible construction of this ambiguous provision under Chevron. Emphasizing the incidental character of the charge-nurses' supervisory authority over CNAs in attending to a shared operational-level duty of their employment, the Board's construction simply reflects an underlying assessment that as a practical matter these LPN charge-nurses are more worker--at most no more than "straw-boss" --than they are "foreman" in these health-care industry work-forces. That construction should therefore be upheld as one owed deference by this court and the findings made by the Board in applying it upheld as supported by substantial evidence.

22

II

As earlier asserted, the majority's contrary conclusion is reached by declining to accord the Board's decisions the deference normally commanded by APA § 706 and Chevron, instead effectively reviewing the Board's decisions de novo, both as to legal conclusions and factual findings. The majority never says that this is its process, nor even expressly acknowledges the relevance of APA§ 706 and Chevron to that process, but that this was effectively its process is evident from the analysis described in its opinion and from the result reached.

First off, the majority simply disregards the Board's construction of "independent judgment," never asking the hard questions about it that are commanded by the deferential "arbitrary or capricious" standard of APA § 706 and the "permissible construction" standard of Chevron. Instead, purporting to find in the Board's decisions on LPN supervisor status an "irrational inconsistency" that apparently disentitled its construction to any deference, the majority simply adopts de novo its own interpretation of what it seemed to treat as the term's plain statutory meaning. And the construction it adopts is one so stringent in formulation that under it all exercises of supervisory authority except those involving no discretion would appear to involve "independent" judgment. According to the majority, to exercise authority "with `independent judgment' mean[s] that it must be exercised in a non-ministerial way to achieve management goals." If "ministerial" is given its ordinary legal meaning in this construction, only supervisory activities carried out under rigidly prescribed guidelines leaving no room for discretion--that is, imposing "ministerial" duties--could be found not to involve independent judgment. See Black's Law Dictionary 996 (6th ed. 1990) (defining "ministerial duty").

Then, without any reference to the deferential review of factual findings commanded by the substantial evidence standard, see Universal Camera Corp., 340 U.S. at 488, the majority describes its fact-finding review function as being to "determine whether the facts of record fulfill the statutory requirements of `supervisor,'" which include of course the majority's construction of"independent judgment." Inevitably then, reviewing directly the"facts of record" under its own construction of "independent judgment," the majority

23

concludes--in what has all the appearance of raw fact-findings--that the LPN charge nurses are supervisors under the NLRA.

We of course cannot know what result the majority would have come to had it carefully identified and reviewed the Board's quite different legal construction with proper deference rather than simply imposing its own much different one. Nor can we be sure that it applied the construction it posited to the "facts of record" as stringently as its literal formulation suggests it might have. We can be sure, however, of several things about the process it purported to follow.

The first is that the court properly could not simply disregard the Board's construction. That construction was entitled to recognition and deferential review as the necessary first, and likely dispositive, step in the process.[6] The next is that the majority would have faced a formidable--I think impossible--task in explaining why the Board's construction was not entitled to deference under § 706 of the APA and Chevron, even if it were thought that the majority's more stringent construction also could pass muster under those standards. The last is that the majority's construction of "independent judgment," if applied with anything approaching the stringency its "ministerial" standard suggests, would make it almost impossible ever to find any exercise of supervisory authority not one involving "independent judgment." And that is at odds with the Supreme Court's recognition that not all exercises of supervisory authority need be found by the Board to make one a § 2(11) supervisor. See Bell Aerospace, 416 U.S. at 279-83.

This refusal to accord normal deference to the Board's construction of "independent judgment" not only leads to what I believe are wrong results in these cases, it creates bad and troublesome precedent for

_____

[6] A recent Supreme Court decision provides an object lesson in the judicial obligation to recognize and accord deferential review to even facially counterintuitive Board rules as the necessary first step in the "arbitrary [or] capricious" review commanded by APA § 706. See Allentown Mack Sales & Service, Inc., 116 S. Ct. 818, 821-23 (1998) (finding on basis of rigorous, pragmatic review of "puzzling policy" of Board rule, that it was not, however, "arbitrary [or] capricious").

future NLRB (and general agency) review in this circuit. Because of the latter consequence, I believe it important to point out wherein I think the majority strays from proper administrative agency review principles.

Consider first the authority relied upon by the majority for the clearly implied proposition that a course of inconsistency in Board decisions on a particular issue bespeaks "policy bias" which then dis-entitles later Board decisions on that issue to normal deference by rea-son of the demonstrated irrationality of the Board's legal position. Asserting that the Board's recent "shift [of] . . . position" on LPN-supervisor status "has prompted widespread speculation that the Board's decisions on this subject are based not on the [the Act's defi-nition of supervisor) but on a `policy bias'," the majority cites in sup-port of that ominous suggestion four judicial decisions: that of the Supreme Court in Health Care; that of the Sixth Circuit in Caremore, Inc. v. NLRB, 129 F.3d 365 (6th Cir. 1997); and two of this court in, respectively, NLRB v. St. Mary's Home, Inc., 690 F.2d 1062 (4th Cir. 1982), and Glenmark Associates, Inc. v. NLRB, 147 F.3d 333 (4th Cir. 1998). But none of those decisions, including those of this court in St. Mary's and Glenmark, provides valid support for the assertion.

In the passage quoted from Health Care, the Supreme Court is not adverting to any inconsistency of results in a series of Board decisions on LPN charge-nurse status, but simply to the "inconsistency" of the Board's construction of "in the employer's interest" with the statutory language and Court precedent in the very case before the Court. Simi-larly, the Court's reference to a "shift [of] ground" in the Board's position has not to do with any inconsistency of Board decisions, but only with a "shift" by the Board from reliance on statutory construc-tion to non-statutory arguments in the very case before the Court. See Health Care, 511 U.S. at 580. Health Care is not, therefore, about forfeited deference because of a course of inconsistent Board deci-sions, but about perceived error of statutory construction in the case at hand under normal standards of agency review.

Neither, in the passage cited from Caremore, is the Sixth Circuit adverting to a series of inconsistent prior Board LPN-as-supervisor decisions. Instead, the court is faulting a Board refusal in the very case before the court to follow what the court considers settled circuit

25

law on LPN supervisor status. See Caremore, 129 F.3d at 370-71. Neither, therefore, is Caremore a decision about forfeited deference by reason of previous inconsistency of decisions, but simply about what the court considers to be defiance of settled circuit law in the very case before it.

When we turn to the two decisions of this court on which the majority relies for the proposition, we do find the proposition asserted but not, I am satisfied, with any authority or valid basis in administrative law. The proposition first appears in the 1982 split panel decision in St. Mary's Home. There, after reciting the Universal Camera maxim that under the "substantial evidence" standard Board orders may be denied enforcement when the reviewing court is unable on the basis of the whole record to find a Board decision supported by substantial evidence, the majority opined:

> [T]his should be particularly true when the Board is determining supervisory status because of the inconsistency in the Board's application of the statutory definition and of the factors to be used in determining such application. So manifest has this inconsistency been that a commentator recently has aptly observed that "the Board has [so] inconsistently applied the [statutory] definition" of supervisor as to cause one necessarily to speculate "that the pattern[of Board decisions on supervisory status] displays an institutional or policy bias on the part of the Board's employees" as illustrated by a practice of adopting that "definition of supervisor that most widens the coverage of the Act, the definition that maximizes both the number of unfair labor practice findings it makes and the number of unions it certifies." Note, The NLRB and Supervisory Status: An Explanation of Inconsistent Results, 94 Harv. L. Rev. 1713 at 1713-14 and 1721 (1981). For this reason, courts must carefully scrutinize the Board's findings and the record on supervisory status.[7]

_____

[7] In this last quoted sentence, St. Mary's Home expressly adopted a review standard facially less deferential than that normally commanded on the basis that inconsistency bespeaking "policy bias" had been demonstrated to the court's satisfaction. For whatever reason, the majority here does not expressly invoke that critical aspect of the St. Mary's Home decision, but obviously makes the same assumption: that inconsistency bespeaking policy bias diminishes (or completely abolishes) the deference ordinarily commanded in agency review.

St. Mary's Home, 690 F.2d at 1067.

The majority opinion in Glenmark, a later split panel decision on LPN supervisory status, then simply picked up on the St. Mary's Home observations in the course of a lengthy footnote devoted to reviewing and criticizing the Board's LPN-as-supervisor decisions. See Glenmark, 147 F.3d at 339 n.8.**8** Glenmark drew on no other authority than St. Mary's Home for the proposition that inconsistency of prior decisions reveals a policy bias that disentitles a Board decision under current review to normal deference.

It thus appears that the majority's no-deference position in these cases simply emerged out of whole cloth in the St. Mary's Home court's assumption that the Board's inconsistency on the subject of LPN supervisor status revealed a "policy bias" that warranted the position. I do not believe the position has any support in settled administrative law nor--for what it is worth--in the Harvard Law Review Note on whose assumptions of inconsistency and, from that, of "policy bias," the St. Mary's Home court drew. Accordingly, I would take the occasion of this en banc rehearing to pull back from any implication from St. Mary's Home and Glenmark that as a general proposition NLRB decisions on supervisor status in general or LPN supervisor-status in particular are not entitled to the normal deference commanded by 5 U.S.C. § 706 and Chevron .

_____

**8** Several passages in that footnote bear noting as indications of the extent to which the Glenmark court's assumption of Board "policy bias" necessarily influenced the deference with which it reviewed the Board's decision in that case. The note opens with the observation that "This issue of the supervisory status of nurses serves as another example of the NLRB's continuing effort to modify the plain language of § 2(11)." Id. (emphasis added). Later, the Board's post-Health Care construction of "independent judgment" is characterized as an adversarial litigation position taken when the Board "began this latest litigation--attacking the supervisory status of nurses." Id. (emphasis added). And later there appears the suggestion that "[c]redibility is as important to an agency appearing before us as it is to any other litigant", id. (emphasis added), followed by citations to several recent decisions of this court, all since 1997, in which the court is said to have "criticized the Board's question-able positions," hence, presumably, its "credibility" as a "litigant." Id.

27

Take first the assumption of inconsistency of prior decisions on which the further assumption of pro-union policy bias is rested. The only "inconsistency" of which I am aware that is generally understood in administrative law to warrant a withholding of normal deference is that involving an unexplained shift of position on the very issue under review. See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973); see generally Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 11.5 at 206 (1994) ("The dominant law clearly is that an agency must either follow its own precedents or explain why it departs from them.").

In the cases we review, the Board's construction of "independent judgment" involved no such unexplained change of position. As indicated, neither Health Care nor Caremore had held that the Board's LPN-as-supervisor decisions involved such an unexplained change of position. And when one looks independently at the course of Board decisions on the subject, they do not. The only shift in legal position involved in those decisions was from rejected reliance on "interest of the employer" to reliance on "independent judgment" as the element lacking in the "supervisor" definition. To shift positions between alternative grounds for decision (here, alternative grounds of statutory construction) is a time-honored practice in the decisional process, and that one here was adequately explained in the Board's post-Health Care decisions.**9**

_____

**9** Incidentally, the "inconsistency" identified in the Harvard Law Review Note relied upon in St. Mary's Home was not this sort of shift-of-position inconsistency, but a perceived inconsistency between the Board's construction of "supervisor" in "bargaining unit" cases (such as those before us) and its construction in "unfair labor practice" cases (such as that in St. Mary's Home). The note author suggested that this inconsistency's explanation lay in the fact that the Board's (ironically) consistent pattern of decisions in each of the two categories, though inconsistent with each other, both yielded pro-union or pro-labor results. See 94 Harv. L. Rev. at 1718-21. Interestingly, to the extent the Note has any relevance for our purposes, the author's suggested remedy for that inconsistency was not any judicial or statutory alteration of the normal standard of judicial review, which was positively rejected as a proper remedy, but a cessation of using the § 2(11) definition of "supervisor" in certain "unfair labor practice" cases, where it was suggested that common law agency rules should apply. Id. at 1728-31.

To the extent that the majority relies on the <u>St. Mary's Home</u> court's assumption of Board "policy bias" as an independent basis for withholding deference, I do not believe that any accepted principle of administrative law authorizes a judicial refusal to apply normal standards of agency review as a means of countering assumed agency bias. The majority cites no authority to that effect other than that asserted in our <u>St. Mary's Home</u> and <u>Glenmark</u> decisions. The most relevant Supreme Court authority on the general subject actually points in the other direction: requiring that courts accept and accommodate the reality that agencies must be able to adopt policies reflecting ideological policy "biases" of the currently sitting administration. <u>See Pauley v. BethEnergy Mines, Inc.</u>, 501 U.S. 680, 696 (1991) (emphasizing necessity that deference be so informed). As the Court put the point in <u>Chevron</u>:

> While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices--resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

<u>Chevron</u>, 467 U.S. at 865-66; <u>see also Blackburn v. Reich</u>, 79 F.3d 1375, 1382 (4th Cir. 1996) (Williams, J., dissenting) (observing that because of the deference owed agency interpretations based on policy considerations of the elected branches, "`federal judges--who have no constituency--have a duty to respect legitimate policy choices made by those who do'") (quoting <u>Chevron</u>, 467 U.S. at 866).

Common sense and logic point in the same direction. Only uncontrollable mischief can result from courts presuming, on the basis of some perceived policy bias in a course of agency decisions, to confer a general pariah status upon that agency. How long would it persist? Must reinstatement be somehow "earned" by the agency to entitle it once again to normally deferential review? How, as a practical--and legally enforceable--matter could it be "earned?" Would not any deliberate attempt to do so necessarily compromise the integrity of the agency's quasi-judicial function?

29

More critically, the normal standards of review, evenly applied case-by-case, are as adequate to correct error induced by "policy bias" as by any other cause. Put otherwise, only policy bias that induces error detectible under normal review standards--arbitrary or capricious legal conclusions or findings not supported by substantial evidence--are, and need be, of any concern to reviewing courts. Any bias having that effect will adequately reveal itself in even-handed applications of the normal standards. Cf. NLRB v. Pittsburgh Steamship Co., 337 U.S. 656, 659-60 (1948) (holding, in rejecting contention that Board findings must be rejected because of revealed ALJ bias, that courts could properly reject only those findings that carried their "own death wound" by reason of decisional bias).

In sum, I think there is no authority in settled administrative law nor basis in sound administrative law principles for the majority's apparent belief that courts may disregard normal standards of deferential agency review whenever a course of agency decisions persuades them of agency policy bias on a matter at issue. In relying upon St. Mary's Home and Glenmark in which that position is flatly adopted and applied in review of Board decisions, the majority perpetuates bad precedent for this circuit.[10] Judge Murnaghan, Judge Ervin, Judge Michael and Judge Motz join in this dissent.

_____

[10] Because I would uphold the Board's determination that the LPN charge-nurses in these cases are not § 2(11) supervisors, I would also have to address the contention that in refusing to allow cross-examination of union members respecting their pro-union bias, the Board denied the employers due process. I would reject that contention for reasons given in Judge Hall's vacated panel opinion in Glasgow. See Glasgow, 136 F.3d at 360-61.

30