136 F.3d 353
 157 L.R.R.M. (BNA) 2499, 135 Lab.Cas. P 10,118,
135 Lab.Cas. P 10,143
 BEVERLY ENTERPRISES, WEST VIRGINIA, INCORPORATED, d/b/a
Glasgow Rehabilitation and Living Center, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BEVERLY ENTERPRISES, WEST VIRGINIA, INCORPORATED, d/b/a
Glasgow Rehabilitation and Living Center, Respondent.
 Nos. 96-2778, 97-1037.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1997.
Decided Feb. 13, 1998.
Rehearing In Banc Granted; Opinion Vacated March 30, 1998.
 
 ARGUED: Thomas Vincent Walsh, Jackson, Lewis, Schnitzler & Krupman, White Plains, NY, for Petitoner. Joseph Anthony Oertel, NLRB, Washington, DC, for Respondent. ON BRIEF: James D. Williams, Jr., Jackson, Lewis, Schnitzler & Krupman, White Plains, NY, for Petitioner. Frederick L. Feinstein, Gen. Counsel, Linda Sher, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, NLRB, Washington, DC, for Respondent.
 Before HALL and NIEMEYER, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 Review denied and order enforced by published opinion. Judge HALL wrote the opinion, in which Senior Judge PHILLIPS joined. Judge NIEMEYER wrote a dissenting opinion.
 OPINION
 K.K. HALL, Circuit Judge:
 
 
 1
 Beverly Enterprises, West Virginia, Inc., petitions for review of an order of the National Labor Relations Board (NLRB) finding that Beverly violated §§ 8(a)(1) and (5) of the National Labor Relations Act[1] by refusing to bargain with a certified unit of licensed practical nurses at a nursing home it operates in Glasgow, West Virginia. The NLRB cross-petitions for enforcement of the same order. We deny the petition for review and enforce the order.
 
 I.
 A.
 
 2
 This case arises in one of the most difficult areas of labor law--drawing the line between employer and employee. The theory is simple: "supervisors" are the representatives of the employer directing the work and are not "employees" under the Act. In practice, drawing that line is much more difficult, because employees at all levels of an organization, even those performing the most menial tasks, often "lead" or "direct" (and hence "supervise" in the broadest sense) other employees.
 
 B.
 
 3
 Beverly Enterprises, West Virginia, Inc., operates a nursing home called "Glasgow Rehabilitation and Living Center." The home's service and maintenance employees; laundry, dietary, and housekeeping aides; and certified nurse assistants (CNAs) are already members of a bargaining unit represented by the United Steelworkers of America (the union). This case concerns the efforts of the 24 licensed practical nurses (LPNs) to be represented by the union as well.
 
 
 4
 The home has one overall administrator, James Mitchell. There are several departments, each with its own supervisor, as well as a registered nurse (RN) Care Plan Coordinator. The nursing department is headed by a director of nursing, who reports directly to Mitchell. There are also two RN supervisors and an assistant director of nursing.
 
 
 5
 The home has 120 beds and is divided into two 60-bed wings. Care must be rendered around the clock, but upper management is not present all the time. The director of nursing, assistant director, and Care Plan Coordinator work ordinary business hours--8 to 4, Monday through Friday. The RN supervisors are present on two daytime shifts, 7-3 and 3-11, Monday through Friday. LPNs are present on all shifts--four on the daytime shifts and two overnight. Thus, for eight hours each weeknight and for the entire weekend, the LPNs are the senior persons (at least in terms of professional training) physically present at the home. However, an RN is on-call at all times.
 
 
 6
 At the time of the hearing, CNAs were paid $4.55, LPNs $9-$9.50, and RNs over $16 per hour. Fringe benefits are generally equivalent among all three classes, except that CNAs are not eligible to participate in Beverly's § 401(k) savings plan.
 
 
 7
 CNAs are the front-line care providers. They bathe, feed, and clean up after residents. They have regular assignments to their shifts and wings as set under the seniority provisions of their collective bargaining agreement. LPNs perform these primary care tasks, plus charting and dispensing medications. However, in addition to these prosaic duties, the LPNs are nominally "in charge" at night and on weekends, and this case boils down to whether these "charge" duties suffice to make them "supervisors."
 
 C.
 
 8
 When "in charge," LPNs are of course expected to unilaterally deal with dire emergencies--Beverly proffers the example of a fire, in which LPNs must, without awaiting instructions, evacuate the building. LPNs also verbally instruct the CNAs on the performance of their duties and can, if abuse of a patient be suspected, remove a CNA from the building. LPNs cannot, however, independently impose disciplinary measures against a CNA. The LPN may simply write a report of any perceived misconduct; discipline is left to the home's administration. Similarly, LPNs have sporadically prepared written evaluations of CNAs' job performance, but these contain no recommendations as to raises, promotions, or discharge.
 
 
 9
 An LPN can move CNAs between wings to meet any imbalance in the workload, but must first ask for volunteers and then assign strictly by seniority. If a CNA calls in sick, an LPN or sometimes another CNA takes the call. When only one CNA is absent, no replacement is summoned. If more than one is absent, the LPN calls an RN to obtain permission to call a replacement. With permission in hand, the LPN's authority is still closely circumscribed. She must contact CNAs from an on-call list in order of seniority. On at least one occasion, an LPN has required a CNA to work a double shift because excessive absences threatened inadequate staffing.[2]
 
 
 10
 The existing collective bargaining agreement between the union and the CNAs requires CNAs to submit grievances to their "supervisors." Mitchell testified that if two CNAs had a dispute, they could ask an LPN to adjust the grievance. There is no evidence that an LPN has ever done so, and none of the written grievances that Beverly submitted into evidence shows any involvement by an LPN in their adjustment. Moreover, though adjustment of a grievance would require interpretation and application of the collective bargaining agreement, the record is undisputed that LPNs have neither been trained nor instructed to learn about the agreement.
 
 D.
 
 11
 On February 16, 1994, the union requested in writing that Beverly recognize it as the LPNs' collective bargaining representative. Beverly filed an objection with the NLRB's Regional Director on the ground that the LPNs are "supervisors" ineligible for the protections of § 7 of the Act.[3] After a two-day hearing on the issue before an NLRB hearing officer, the Regional Director issued a decision directing an election, finding that the LPNs are not "supervisors." Beverly petitioned the NLRB for review. The NLRB denied review, citing its decisions in Providence Hospital, 320 NLRB 717, 1996 WL 46343 (1996), and Nymed, Inc. d/b/a Ten Broeck Commons, 320 NLRB 806, 1996 WL 48265 (1996).[4] The union won the election by a wide margin (15 to 4) and was certified as the LPNs' bargaining representative. Beverly refused to bargain, and the current unfair labor practice charges were brought. Because Beverly admitted that it refused to bargain and it raised no issue other than the earlier certification of the alleged "supervisors" as a unit, the NLRB transferred the case to itself and granted summary judgment finding that Beverly had violated the Act.
 
 
 12
 Beverly petitions for review of this order, and the NLRB cross-petitions for its enforcement.
 
 II.
 A.
 
 13
 The standard of review is familiar: the order of the NLRB must be enforced if it is in accordance with law and the findings of fact have substantial support in the record as a whole. NLRB v. Nueva Engineering, Inc., 761 F.2d 961, 965 (4th Cir.1985).
 
 
 14
 Section 2(3) of the National Labor Relations Act[5] exempts "supervisors" from the definition of "employees" eligible to bargain collectively. Under § 2(11),[6] a "supervisor" is
 
 
 15
 [a]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 16
 (emphasis added). Thus, there are three essential elements to supervisor status. First, the person must actually have the authority to do one--but not necessarily more than one[7]--of the twelve things listed (hiring, transferring, etc.). It is not essential that the purported supervisor's authority ever be used. NLRB v. Tio Pepe, Inc., 629 F.2d 964, 969-970 (4th Cir.1980). On the other hand, evidence of the authority's use (or lack thereof) is obviously relevant to whether it exists at all.[8] See id. Second, the authority to act must be "in the interest of the employer." Finally, exercise of the authority must require independent judgment and not be merely routine or clerical. This last point is by far the most difficult.
 
 B.
 
 17
 Formerly, the NLRB relied on the second part of the test in charge nurse cases. According to the NLRB, purportedly supervisory actions taken by charge nurses were not "in the interest of the employer," but rather "in the interest of patient care." In NLRB v. Health Care & Retirement Corp., 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994), the Supreme Court rejected the NLRB's theory as a "false dichotomy." Because the employer's business is patient care, an action can be in both the interest of the employer and of patients. The Court took pains to specify, however, that its opinion "cast[ ] no doubt on Board or court decisions interpreting parts of § 2(11) other than the specific phrase 'in the interest of the employer.' " 511 U.S. at 583, 114 S.Ct. at 1785. Moreover, the Court stated that it is "no doubt true" that "phrases in § 2(11) such as 'independent judgment' and 'responsibly to direct' are ambiguous, so the Board needs to be given ample room to apply them to different categories of employees." Id. at 579, 114 S.Ct. at 1783.
 
 
 18
 Beverly repeatedly asserts the NLRB is biased against finding charge nurses to be "supervisors," as the bare existence of the policy rejected in Health Care & Retirement Corp. supposedly proves. This argument gets us nowhere. The NLRB has certainly not admitted such a bias, and this court has no choice but to apply the general § 2(11) law to the facts of the case. As Justice Frankfurter put it decades ago, in a case where a similar charge was leveled against the NLRB:
 
 
 19
 According to an early English judge, "The devil himself knoweth not the mind of man", and a modern reviewing court is not much better equipped to lay bare unexposed mental processes. It is a grave responsibility to conclude that in admitting the testimony of the Company's employees, the Board went through a mere pretense of obedience to the Court's direction, and heard the testimony with a deaf ear and a closed mind. In light of the authority with which Congress has endowed the Board, and with due regard to the conscientiousness which we must attribute to another branch of government, we cannot reject its explicit avowal that it [followed the Court's mandate] unless an examination of the whole record puts its acceptance beyond reason.
 
 
 20
 NLRB v. Donnelly Garment Co., 330 U.S. 219, 229, 67 S.Ct. 756, 762, 91 L.Ed. 854 (1947). The NLRB has explicitly avowed that it has followed the decision in Health Care & Retirement Corp. and that it applied general § 2(11) law in this case. Because it is not "beyond reason" for us to accept these avowals, we must take the NLRB at its word.[9]
 
 C.
 
 21
 Every organization--from empire to stamp club--has, or unwittingly winds up with, a pecking order. Only at the very lowest tier of a business can one find a person who does not occasionally direct some other person to do something. Lest the chiefs far outnumber the Indians, Congress crafted § 2(11)'s enigmatic standard, intending to exempt true management from the Act while still protecting the § 7 rights of " 'straw bosses, leadmen, and set-up men, and other minor supervisory employees.' " NLRB v. Bell Aerospace Co., 416 U.S. 267, 280-281, 94 S.Ct. 1757, 1765, 40 L.Ed.2d 134 (1974) (quoting Sen. Rep. No. 105, 89th Cong., 1st Sess. 4 (1947)).
 
 
 22
 If any authority over someone else, no matter how insignificant or infrequent, made an employee a supervisor, our industrial composite would be predominantly supervisory. Every order-giver is not a supervisor. Even the traffic director tells the president of a company where to park his car. NLRB v. Security Guard Service, 384 F.2d 143, 151 (5th Cir.1967).
 
 
 23
 There is yet another tangle. The Act extends "employee" status to "professional employees," and § 2(12)[10] defines such persons as those who, among other things, "engage[ ] in work ... involving the consistent exercise of discretion and judgment in its performance[.]" Thus, "independent judgment" in § 2(11) must mean something different than "consistent exercise of ... [professional] judgment" in § 2(12), or else most professionals would be simultaneously protected and unprotected by the Act. The key to harmonizing the definitions is the word "routine" in § 2(11). Though they may require a great deal of skill, the "routine" decisions of a trained professional do not involve "independent judgment" as contemplated by § 2(11). Consequently, though a professional may, in his own discretion, regularly direct a coworker to do something, supervisory status will only be found where his exercise of judgment involves something beyond that customarily exercised by similarly situated professionals. Providence Alaska Medical Center v. NLRB, 121 F.3d 548, 554 (9th Cir.1997); cf. NLRB v. Yeshiva University, 444 U.S. 672, 690, 100 S.Ct. 856, 866, 63 L.Ed.2d 115 (1980) (applying Act's managerial exclusion).
 
 
 24
 In sum, § 2(11) is a tough nut, and we are mindful that "[h]ere, as in other cases, we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life." NLRB v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963).
 
 
 25
 These "complexities" are substantial. To illustrate, and cognizant of the risks, we will hazard a sports analogy. Suppose a professional football team has a rookie quarterback. The quarterback "assigns" and "leads" work on the field; indeed, all must strictly follow his snap count or else march steadily backward five yards at a time. Nonetheless, he is not really "independent." The coach composes the playbook and even calls the individual plays; these instructions closely limit his avenues of action. He "leads" but does not "supervise."
 
 
 26
 Now posit the experienced, Hall-of-Fame caliber quarterback. The playbook is designed to exploit his skills, and he can freely change any play suggested by his coaches according to his on-the-spot assessment of the defense. During training camp, the coach consults him about which players to keep and cut, and takes his advice seriously. Is the quarterback now a "supervisor"? The question is rhetorical; it simply illustrates that there are countless gradations and sources of authority, and it can be difficult to draw the line.[11] But the line must be drawn.
 
 
 27
 The hard cases, like our Hall-of-Fame quarterback's, arise where the purported "supervisor" truly does call a lot of the shots, but only because he has professional training, a great deal of experience, or some other uncommon aptitude. Is such an employee's exercise of judgment "independent" as that term is used in § 2(11)?
 
 
 28
 Here, we agree with the NLRB that Beverly's LPNs do not exercise sufficient independent judgment to make them "supervisors." Each "decision" an LPN makes is cabined to a few narrow, preselected choices; often there is no real choice at all. The LPNs cannot independently affect the terms of employment of anyone, and the level of their "direction" of the CNAs is not at all disproportionate to their higher level of professional training.
 
 
 29
 Lastly, Beverly points out that, unless the LPNs are "supervisors," no one is in "charge" of the home for much of the time. But that is not right. No one is physically there, but someone--an on-call RN--is always available. Judge Posner made this point more pithily than can we:
 
 
 30
 A night watchman is not a supervisor just because he is the only person on the premises at night, and if there were several watchmen it would not follow that at least one was a supervisor.
 
 
 31
 NLRB v. Res-Care, Inc., 705 F.2d 1461, 1467 (7th Cir.1983).
 
 
 32
 The NLRB's decision that Beverly's LPNs are not "supervisors" is in accordance with law and has substantial support in the record.
 
 III.
 
 33
 In its brief, Beverly also complains that its inability to cross-examine union witnesses as to possible pro-union "bias" deprived it of due process. We disagree, for several reasons. First, Beverly does not substantially dispute that the duties of the LPNs are as the Regional Director found them. Second, the witnesses about whom Beverly protests most emphatically wore their pro-union sentiment on their sleeves.[12] Indeed, Beverly complains that it was prevented "from examining the witnesses as to the bias evident in their demeanor and testimony. " Brief of Petitioner, at 35 (emphasis added). Further exploration of those "evident" sentiments would not likely have been useful or illuminating. Finally, because the hearing took place during the organizing drive, some of the attempted cross-examination--e.g. when did the drive begin?--could be deemed coercive interrogation in violation of § 8(a)(1) of the Act.[13] See generally Winchester Spinning Corp. v. NLRB, 402 F.2d 299, 302-303 & n. 1 (4th Cir.1968) ("It is enough [to violate § 8(a)(1) ] that employer interrogation has a tendency to inhibit the free exercise of rights protected by the Act."). The hearing officer specifically cited the potentially coercive nature of these questions in precluding them. In sum, we believe that the hearing was fair and afforded Beverly the process to which it was due, given the hearing's timing and purpose. See generally Mathews v. Eldridge, 424 U.S. 319, 334-335, 96 S.Ct. 893, 902-903, 47 L.Ed.2d 18 (1976) (emphasizing flexibility of concept of due process).
 
 
 34
 At oral argument, Beverly enlarged this modest, specific due process argument into a general assault on the fairness of NLRB representation hearings and the preclusive effect given their results in subsequent unfair labor practice proceedings.
 
 
 35
 We doubt that this broad attack was properly presented for our review, but, in any event, it is meritless. There are very few novel arguments in labor law, and Beverly's is not one of them. It has been previously rejected by the Supreme Court, Congress, and this court.
 
 
 36
 Over fifty years ago, the Supreme Court ruled that, absent the proffer of material evidence unavailable at the representation hearing, "a single trial of the issue was enough," and the NLRB did not err in refusing to permit relitigation in the unfair labor practice proceeding. Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 162, 61 S.Ct. 908, 917, 85 L.Ed. 1251 (1941).[14] Subsequently, in the Administrative Procedure Act, Congress exempted proceedings involving "inspections, tests, or elections" or "the certification of worker representatives" from the Act's general requirement that agency adjudications be conducted by administrative law judges. 5 U.S.C. §§ 554(a)(3), (6).
 
 
 37
 But most directly on point is NLRB v. Union Brothers, Inc., 403 F.2d 883 (4th Cir.1968). In Union Brothers, the supervisory status of an employee was at issue. The hearing officer recommended a finding that the employee was a supervisor, which the NLRB adopted. Because the employee's vote, if counted, would have deprived the union of majority status, the employer refused to bargain. Unfair labor practice charges were filed, and, with no new evidence submitted, the NLRB entered summary judgment against the employer. The parallels to this case are self-evident.
 
 
 38
 On the NLRB's application for enforcement of its order, the employer argued that the entry of summary judgment violated due process and the Administrative Procedure Act. We rejected the due process challenge based on Pittsburgh Plate Glass and the unanimous view of "every circuit that has considered it." 403 F.2d at 887 (collecting cases). Likewise, because Congress expressly exempted representation and election issues from the Act's administrative law judge requirement, we decided that the Act was not violated by the NLRB's procedure. Id. at 888. Indeed, the exemption would have no practical effect if purely derivative unfair labor practice proceedings were conducted de novo by an administrative law judge. See NLRB v. Champa Linen Service Co., 437 F.2d 1259, 1262 (10th Cir.1971).
 
 
 39
 Beverly's petition for review is denied, and we grant enforcement of the NLRB's order.
 
 
 40
 REVIEW DENIED; ENFORCEMENT GRANTED.
 
 NIEMEYER, Circuit Judge, dissenting:
 
 41
 As the majority opinion notes in the related case, Beverly Enterprises Virginia, Inc. v. NLRB, 136 F.3d 361, (4th Cir.1998), the facts in this case are similar to the related case, although LPNs' supervisory activity in this case is somewhat more restrained because of a collective bargaining agreement in force between the employer and the certified nurses aides (CNAs). Thus, for example, when replacing an absent CNA, the supervising licensed practical nurse (LPN) must call other CNAs in order of seniority. But in all material respects, the facts are similar and therefore the LPNs are supervisors as defined by § 2(11) of the NLRA, 29 U.S.C. § 152(11). During substantial periods of time, the LPNs in this case are the highest ranking representatives of the employer at the Glasgow Rehabilitation and Living Center, and as ranking supervisors, the LPNs are authorized to change CNAs' assignments, to report CNAs who do not perform properly, and even to suspend them in circumstances where patient abuse is suspected.
 
 
 42
 For the reasons that I gave in the related Beverly Enterprises case, also decided today, I would grant the petition for review and deny enforcement of the NLRB's order.
 
 
 
 [1]
 29 U.S.C. §§ 158(a)(1), (5)
 
 
 [2]
 The hearing officer noted, and Beverly does not dispute, that minimum staffing levels are set by state and federal law
 
 
 [3]
 29 U.S.C. § 157 (guaranteeing "[e]mployees ... the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and ... to refrain from any and all of such activities....")
 
 
 [4]
 Member Cohen dissented in Providence Hospital and Ten Broeck Commons, and he dissented here for the reasons he expressed in those two cases
 
 
 [5]
 29 U.S.C. § 152(3)
 
 
 [6]
 29 U.S.C. § 152(11)
 
 
 [7]
 See Monongahela Power Co. v. NLRB, 657 F.2d 608, 612 (4th Cir.1981) ("It is well established that [ § 2(11) ] is to be read in the disjunctive, so that an individual possessing any of the[twelve listed] powers is considered a 'supervisor' for purposes of the Act.")
 
 
 [8]
 As a corollary to this point, job titles or descriptions may be some evidence of the purported supervisor's actual duties, but those duties, and not their label, are the controlling factor. See NLRB v. St. Mary's Home, Inc., 690 F.2d 1062, 1066 (4th Cir.1982) (deeming job titles "meaningless")
 
 
 [9]
 It is true, as Beverly emphasizes, that fifteen years ago we approvingly quoted a law review article that was sharply critical of NLRB decisions concerning supervisory status and that posited the existence of a "policy bias" in favor of widening the coverage of the Act. See St. Mary's Home, 690 F.2d at 1067. Consequently, we concluded that we should "carefully scrutinize the Board's finding and the record on supervisory status." Id. Even if our assessment of NLRB policy then could fairly be applied to impugn the integrity and motives of its current members, it would not alter our analysis of this case. We do our best--however imperfectly--to "carefully scrutinize" every case that confronts us
 
 
 [10]
 29 U.S.C. § 152(12)
 
 
 [11]
 As the Supreme Court once noted,
 "the gradations of authority 'responsibly to direct' the work of others from that of general manager or other top executive to 'straw boss' are so infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition of a 'supervisor.' "
 Marine Engineers Beneficial Ass'n v. Interlake Steamship Co., 370 U.S. 173, 179-180 n. 6, 82 S.Ct. 1237, 1240-1241 n. 6, 8 L.Ed.2d 418 (1962) (quoting NLRB v. Swift & Co., 292 F.2d 561, 563 (1st Cir.1961)).
 
 
 [12]
 For example, one LPN testified that she had told Mitchell that she felt "we have the right to be in the Union and we feel that we deserve to be in the Union."
 
 
 [13]
 29 U.S.C. § 158(a)(1)
 
 
 [14]
 This circuit has followed Pittsburgh Plate Glass faithfully. See,e.g., NLRB v. 1199, Nat'l Union of Hospital & Health Care Employees, 824 F.2d 318, 323 (4th Cir.1987); NLRB v. Honaker Mills, 789 F.2d 262, 268 (4th Cir.1986). The NLRB's regulations incorporate its rule as well. See 29 C.F.R. § 102.67(f) ("Denial of a request for review shall constitute an affirmance of the regional director's action which shall ... preclude relitigating any such issues in any related subsequent unfair labor practice proceeding.")