Filed: February 17, 1999

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

Nos. 96-2778(L)
(9-CA-34245)

_____

Beverly Enterprises, etc.,

Petitioner,

versus

National Labor Relations Board,

Respondent.

_____

O R D E R

_____

The court amends its opinion filed January 19, 1999, as follows:

On page 6 -- the first sentence of the dissent is corrected to read: "I dissent in both Nos. 96-2778/97-1037 (<u>Glasgow</u>) and 96-2779/97-1078 (<u>Carter Hall</u>)."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BEVERLY ENTERPRISES, WEST
VIRGINIA, INCORPORATED, d/b/a
Glasgow Rehabilitation and Living
Center,
Petitioner,

v.

No. 96-2778

NATIONAL LABOR RELATIONS BOARD,
Respondent.

AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL
ORGANIZATIONS (AFL-CIO),
Amicus Curiae.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

BEVERLY ENTERPRISES, WEST
VIRGINIA, INCORPORATED, d/b/a
Glasgow Rehabilitation and Living

No. 97-1037

Center,
Respondent.

AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL
ORGANIZATIONS (AFL-CIO),
Amicus Curiae.

On Petition for Review and Cross-application
for Enforcement of an Order of the
National Labor Relations Board.
(9-CA-34245)

Argued: June 2, 1998

Decided: January 19, 1999

Before WILKINSON, Chief Judge, and WIDENER,
MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON,
LUTTIG, WILLIAMS, MICHAEL, MOTZ, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Petition for review granted and cross-application for enforcement
denied by published opinion. Judge Niemeyer wrote the majority
opinion, in which Chief Judge Wilkinson and Judges Widener, Wil-
kins, Hamilton, Luttig, and Williams joined. Senior Judge Phillips
wrote a dissenting opinion, in which Judges Murnaghan, Ervin,
Michael, and Motz joined.

_____

**COUNSEL**

**ARGUED:** Andrew Allen Peterson, JACKSON, LEWIS, SCHNITZ-
LER & KRUPMAN, White Plains, New York, for Petitioner. Linda
Jill Dreeben, NATIONAL LABOR RELATIONS BOARD, Washing-
ton, D.C., for Respondent. **ON BRIEF:** James D. Williams, Jr.,
Thomas V. Walsh, JACKSON, LEWIS, SCHNITZLER & KRUP-
MAN, White Plains, New York, for Petitioner. Frederick L. Feinstein,
General Counsel, Linda Sher, Associate General Counsel, Aileen A.
Armstrong, Deputy Associate General Counsel, Joseph A. Oertel,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for
Respondent. Jonathan P. Hiatt, AFL-CIO, Washington, D.C.; David
M. Silberman, Laurence Gold, Washington, D.C., for Amicus Curiae.

_____

**OPINION**

NIEMEYER, Circuit Judge:

After Beverly Enterprises, West Virginia, Inc., refused to bargain
with a unit certified by the National Labor Relations Board that

2

included licensed practical nurses who are functioning as "charge nurses," the Board found that Beverly Enterprises had committed unfair labor practices under §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("NLRA"). Beverly Enterprises filed this petition for review, arguing that licensed practical nurses were "supervisors" under § 2(11) of the Act and thus were not entitled to organize and bargain collectively pursuant to § 7. For the reasons given in the substantively similar case, Beverly Enterprises, Virginia, Inc. v. NLRB, No. 96-2779(L), ___ F.3d ___ (4th Cir. 1998), which we have also decided today, we hold that these licensed practical nurses are "supervisors" under the Act. Accordingly, we grant Beverly Enterprises' petition and deny the Board's application for enforcement of its order.

I

Because this case is slightly distinguishable factually from Beverly Enterprises, Virginia, Inc. v. NLRB, No. 96-2779(L), ___ F.3d ___ (4th Cir. 1998), we summarize the most pertinent facts presented in this case.

Beverly Enterprises, West Virginia, Inc., operates Glasgow Rehabilitation and Living Center, a nursing home which serves 120 patients housed in two wings of equal size. An Administrator runs the nursing home. The nursing department is run by a Director of Nursing, who reports to the Administrator, and an Assistant Director of Nursing, who reports to the Director of Nursing. A registered nurse holds the position of Care Plan Coordinator and two additional registered nurses serve as RN Supervisors. Direct patient care is provided by 24 licensed practical nurses ("LPNs"), who report to the Director of Nursing and the RN Supervisors, and 50-60 certified nursing assistants, who report to the LPNs and the RN Supervisors.

The Glasgow nursing home operates on a three-shift schedule, with shifts from 7:00 a.m. to 3:00 p.m., 3:00 p.m. to 11:00 p.m., and 11:00 p.m. to 7:00 a.m. The Director and Assistant Director of Nursing, as well as the Care Plan Coordinator, work the first shift (8:00 a.m. to 4:00 p.m.) each weekday, while the two RN Supervisors work the first and second shifts each weekday. On weekends an Assistant Activities Director or a department head works for four hours each Saturday and Sunday. During all remaining times, which amount to

3

almost one-half of the total hours in the week, the LPNs are the most senior staff at the nursing home. While the LPNs "maintain overall operation of the home" during this time, they are able to contact a registered nurse who is "on call."

In addition to performing a wide array of patient care tasks, the LPNs occupy the position of charge nurse and thus are "in charge" of the nursing home during the hours when the registered nurses are not at the facility. According to the LPNs' job performance requirements, LPNs at Glasgow "will serve as Charge Nurse[s] of the unit to which assigned and will direct the care of that unit within the framework of the policies of this nursing home [, i]n addition to participating in and supervising all care of patient needs and giving or directing that care which is of a skilled nature." LPNs must "maintain overall operation of the home in the absence of the supervisor, director of nurses, and administrator, notifying any of them when necessary." And LPNs must "initiate assignments to aides . . . and change if necessary upon ensuring proper quality of . . . care."

The certified nursing assistants' job performance requirements provide that they must "adher[e] to instructions issu[ ]ed by the nurse." They also "[w]ork[ ] under supervision" and are supervised by the charge nurse, whether that nurse is a registered nurse or an LPN.

Although the LPNs direct the certified nursing assistants in their work, their discretion in the assignment of work and the ability to transfer certified nursing assistants from one wing to the other is somewhat constrained by the certified nursing assistants' collective bargaining agreement. Thus, for example, when replacing an absent certified nursing assistant or assigning certain work tasks, the supervising LPN must call certified nursing assistants in the order of seniority specified by the collective bargaining agreement. It appears undisputed, however, that there are some collateral tasks which LPNs may, in their discretion, assign to certified nursing assistants, such as work in the special medicare unit.

While the collective bargaining agreement controls decisions involving permanent transfers of certified nursing assistants and prescribes break and lunch times, it still remains the duty of the LPNs to monitor certified nursing assistants to ensure that they complete

4

their assignments and do them properly. When new certified nursing assistants arrive, it is the LPNs' responsibility to determine when the new employees are sufficiently trained to accept full assignment.

The LPNs may also undertake various forms of disciplinary action against certified nursing assistants. In particular, while LPNs may not suspend or discharge certified nursing assistants without prior approval of the Director or Assistant Director of Nursing, the LPNs may informally counsel them and may give them either an oral or a written warning. And although this power has not been used, the LPNs are also authorized to suspend a certified nursing assistant on the spot when the nursing assistant is suspected of patient abuse.

Finally, when the Administrator, the Director of Nursing and the Maintenance Supervisor are not at the facility and a fire alarm occurs, "the senior charge nurse will be in charge of the facility and the senior charge nurse will direct fire alarm procedures."

In 1994, the United Steelworkers of America, the Union which represents Glasgow's service employees, maintenance employees, and certified nursing assistants, petitioned the National Labor Relations Board to recognize the Union as the LPNs' collective bargaining representative. Beverly Enterprises contested the Union's authority to represent the LPNs, arguing that the LPNs were supervisors, not entitled to unionize under § 7 of the NLRA, 29 U.S.C. § 157. The Regional Director rejected Beverly Enterprises' argument and directed an election.

Following the election, which the Union won, the Union attempted to bargain with Beverly Enterprises, but Beverly Enterprises refused. The Board thereafter found that Beverly Enterprises had committed unfair labor practices in violation of §§ 8(a)(1) and 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(1) & (5).

On appeal from the Board's order, a divided panel of this court granted the Board's petition for enforcement, holding that Beverly Enterprises' LPNs were not supervisors under the NLRA. See Beverly Enterprises, West Virginia, Inc. v. NLRB, 136 F.3d 353 (4th Cir. 1998). By order dated March 30, 1998, the full court vacated that panel opinion and ordered that the case be reheard en banc.

5

II

Beverly Enterprises argues that the new unit certified by the NLRB was contrary to the NLRA because it consisted of supervisors. It also argues that it was deprived of due process when the hearing officer, who initially heard this case, declined to allow Beverly Enterprises to question certain witnesses for pro-union bias.

Addressing Beverly Enterprises' main point that its LPNs are supervisors, we apply the principles set forth in the companion case, Beverly Enterprises, Virginia, Inc. v. NLRB, No. 96-2779(L), also decided today, to conclude that the LPNs in this case are likewise supervisors and are not appropriately included in collectively bargaining units. The record clearly demonstrates that for almost one-half of the working hours at the Glasgow nursing home, LPNs are the most senior staff present. During this time, they are responsible for maintaining the overall operation of the home and for directing the work of the certified nursing assistants. They are responsible for assigning collateral tasks to nursing assistants at their discretion, for monitoring the nursing assistants to ensure that they do their jobs properly, for counseling and writing up nursing assistants' performance, for determining when nursing assistants are ready to handle full assignment, and for immediately suspending nursing assistants who are suspected of patient abuse. The authority and responsibilities given the LPNs at Glasgow are not sufficiently distinguishable from those articulated in our companion case to require a different result. Accordingly, we hold that the LPNs at Glasgow are supervisors within the definition of 29 U.S.C. § 152(11).

Because we reach this conclusion, we need not address Beverly Enterprises' due process argument.

Accordingly, Beverly Enterprises' petition for review is granted and the NLRB's decision is reversed. The NLRB's application for enforcement of its order is denied.

IT IS SO ORDERED.

PHILLIPS, Senior Circuit Judge, dissenting:

I dissent in both Nos. 96-2778/97-1037 (Glasgow) and 96-2779/97-1098 (Carter Hall). I would enforce the Board's orders and deny the petitions for review in both of these cases

6

essentially for the reasons given in Judge Hall's majority opinions in the two vacated panel decisions. See Beverly Enters., W. Va., Inc. v. NLRB, 136 F.3d 353 (4th Cir. 1998) (hereinafter Glasgow); Beverly Enters., Va., Inc. v. NLRB, 136 F.3d 361 (4th Cir. 1998) (hereinafter Carter Hall). As those opinions cogently demonstrate, the Board's decisions, properly reviewed, are supported by substantial evidence and are not contrary to law.

The en banc majority's contrary conclusion is reached by failing to accord the judicial deference owed both to the Board's construction of the enigmatic "independent judgment" element of the famously ambiguous statutory definition of "supervisor" and to the Board's findings of fact in application of that construction. Instead, as I will later demonstrate, the majority effectively conducts de novo review of the Board's decisions, first adopting its own legal construction of the critical independent judgment requirement, then applying it in plenary review of the evidence to conclude that the LPN charge-nurses in these cases were "supervisors" under § 2(11) of the Act.

I do not believe that any licence so to skew normal standards of judicial review in these cases properly can be found in the justifications upon which the majority seems to rely. That being so, the normal standards apply, requiring that deference be accorded both to the Board's construction of "independent judgment" as a reasonable, not arbitrary, one and to its findings of fact made in application of that construction as plausible ones. If that be done, the Board's decisions that these LPNs are not supervisors were supported by substantial evidence on the record considered as a whole and were not contrary to law. I would so hold.

I

The real issue in these and comparable LPN-as-supervisor cases around the circuits concerns the Board's construction of the "independent judgment" requirement rather than its raw fact-finding processes in deciding these cases. For if the Board's construction is upheld as one owed deference, its findings in application--that the limited authority exercised (or had) by LPNs over CNAs in these cases did not involve the use of "independent judgment"--are unassailable. And, conversely, if the majority's different construction in disregard

7

of the Board's is applied, its contrary conclusion that independent judgment was involved, is equally unassailable. **1** I therefore address the Board's construction and the deference we owe it as effectively dispositive of these cases.**2**

Consider the daunting problem of statutory construction that always has faced the Board in giving legal meaning to the term "supervisor" for application in these cases. It is a "tough nut" as Judge Hall pithily put it in the now-vacated panel decision in Glasgow. Glasgow, 136 F.3d at 359. It begins with Congress's own understandable difficulty in defining "supervisor" when, in 1947, it took that category of "employee" out of the organizational, representational, and

_____

**1** That this issue is the decisive one is readily demonstrated by considering the decisions giving rise to the current post-Health Care circuit conflict on the question of LPN "independent judgment," hence "supervisor" status. As noted by the en banc majority, these decisions include on one side this court's decision in Glenmark Assocs., Inc. v. NLRB, 147 F.3d 333 (4th Cir. 1998), that of the Third Circuit in Passavant Retirement & Health Center v. NLRB, 149 F.3d 243 (3d Cir. 1998), and of the Sixth Circuit in Mid-America Care Foundation v. NLRB, 148 F.3d 638 (6th Cir. 1998), all rejecting Board determinations that LPNs were not supervisors because they did not exercise independent judgment; and, on the other side, the decisions of the D.C. Circuit in Beverly Enterprises-Pennsylvania, Inc. v. NLRB, 129 F.3d 1269 (D.C. Cir. 1997), of the Eighth Circuit in Beverly Enterprises v. NLRB , 148 F.3d 1042 (8th Cir. 1998), and of the Ninth Circuit in Providence Alaska Medical Center v. NLRB, 121 F.3d 548 (9th Cir. 1997), all upholding similar Board determinations. While inevitably there are factual distinctions between the LPN activities vis-a-vis CNAs in these cases, there is a sufficiently common pattern respecting their assignment, directive, and disciplinary activities that makes it obvious that the different results turn not on any significant factual differences, but on the way "independent judgment" is construed and back of that, on the judicial deference owed the Board's construction. That this is the actual source of the current circuit split seems to be tacitly recognized by the en banc majority. (See Maj. Op. in Carter Hall at 14.)

**2** Which is to say that if that construction is applied, the evidence clearly supports the Board's decisions, as is demonstrated by Judge Hall's evidence assessment in the two vacated panel opinions--which I adopt by reference. See Glasgow, 136 F.3d at 359-60; Carter Hall, 136 F.3d at 362-63.

8

bargaining protections of the Act. The inevitably ambiguous definition that emerged as § 2(11) of the Act is one that from the outset has defied easy administrative and judicial construction and application.

A supervisor is

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

From this bare text it is not possible to say with confidence much more than the obvious: that to be a "supervisor" (1) an employee must have the authority to do at least one of the twelve statutorily enumerated activities vis-a-vis other employees; (2) that the authority to do so must be held "in the interest of the employer" and (3) that the authority must be such that its exercise is not of a "merely routine or clerical nature" but "requires the use of independent judgment." See NLRB v. Health Care & Retirement Corp. of Am., 511 U.S. 571, 573-74 (1994) (so parsing the statutory language). The first requirement--that authority exists--presents no problem of construction (nor, usually, of application). But the meaning of the additional requirements that the authority be held in the "interest of the employer" and that it be such that its exercise requires the use of "independent judgment" as opposed to being of a "merely routine or clerical nature" surely is far from plain. What delegated authority from an employer to do anything concerning its business is not presumptively "in the interest of the employer"--to some extent at least? How "independent" must be the judgment used in exercising authority over fellow-employees to make its exercise "not merely routine or clerical in nature?" May not "routine" and "clerical" activities themselves sometimes require the use of "independent judgment;" are these inveterate opposites? And so on.

9

Confronted with this basic ambiguity in the Act's definition of "supervisor," the Board (and reviewing courts) properly have sought guidance in relevant legislative history. Doing so, they properly have recognized that Congress's principal definitional concern was at the margins of supervisory authority: with differentiating the lowest level of true supervisors such as foremen--undoubted members of management--from their near-relation, the "straw-boss" or "leadman" who, though frequently exercising delegated authority to direct and assign fellow employees, was as a practical matter not a part of management but just another member of the work force. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 280-81 (1974) (citing S. Rep. No. 89-105, at 4 (1947), as so indicating legislative intent). Accepting this indication of Congress's basic policy concern, the Supreme Court early on recognized its implication that the Board need not consider every employee who performed some "minor supervisory duties" to be a § 2(11) "supervisor." See id.  at 274-90; see also Marine Eng'rs Beneficial Ass'n v. Interlake Steamship Co., 370 U.S. 173, 179 n.6 (1962) (agreeing that "gradations of authority" to direct work of others in work force were so "infinite and subtle" that Board must have a "large measure of . . . discretion" in determining who in exercising such authority was and was not a § 2(11) supervisor) (quoting NLRB v. Swift & Co., 292 F.2d 561, 563 (1st Cir. 1961)).

Adding to the intrinsic difficulty posed by § 2(11)'s ambiguous definition of "supervisor" is the contemporaneous amendment respecting "professional" employees, such as the LPNs in our cases. At the same time that Congress defined and excluded "supervisors" from the Act's protections in § 2(11), it defined for continued inclusion "professional" employees. See 29 U.S.C. § 152(12) (definitional section); id. § 159(b) (limiting Board's discretion to include professional and non-professional employees in same bargaining unit). Critically, in defining "professional employee" Congress identified as one of his hallmarks that he "engage[s] in work. . . involving the consistent exercise of discretion and judgment in its performance[.]" Id. § 152(12) (emphasis added). Inescapably, this § 2(12) definition of the included professional juxtaposed with the § 2(11) definition of the excluded supervisor gave rise to a "tension" between the two that further exacerbated the problem of construing § 2(11). See NLRB v. Yeshiva Univ., 444 U.S. 672, 686 (1980) (so recognizing). Although the Supreme Court has rejected the contention that this "tension"

10

requires that professional employees be distinguished from other employees "for purposes of the definition of supervisor," see Health Care, 511 U.S. at 581, the tension nevertheless remains to challenge the Board and reviewing courts in construing § 2(11). The reality remains that professional employees' "consistent exercise of discretion and judgment in [the] performance of[their work]," 29 U.S.C. § 152(12), invariably will include the exercise of authority to "assign" and "responsibly . . . direct" the activities of those less-skilled employees who traditionally act as "elbow assistants" in performing professionals' assigned work. See NLRB v. Res-Care, Inc., 705 F.2d 1461, 1465 (7th Cir. 1983) (Posner, J.) (citing as examples the lawyer's secretary, the teacher's aide, the doctor's nurse, and the nurse's aide). And, it remains inescapable that unless such professional employees are nevertheless not considered on that account alone to be supervisors under the § 2(11) definition, then Congress's intent categorically to include them in the Act's protections will be effectively undercut.

Seeking to accommodate the definitional tension, the Board first thought the answer could properly be found in § 2(11)'s "interest of the employer" requirement. In the specific context of LPNs exercise of assignment and work direction authority over CNAs, the Board took the adjudicative position that "a nurse's direction of less-skilled employees, in the exercise of professional judgment incidental to the treatment of patients, is not authority exercised`in the interest of the employer.'" See Health Care, 511 U.S. at 574 (so characterizing Board's adjudicative position). Rather, the Board ruled, in affirming an ALJ's decision, that in giving this sort of direction, the LPNs' supervisory activities did not "equate to responsibly . . . direct[ing] the aides in the interest of the employer," their"focus" instead being "on the well-being of the residents rather than of the employer." Id. at 575 (quotation and emphasis omitted). In Health Care, the Supreme Court rejected this construction, holding that it was based upon a "false dichotomy" between acts taken in employer interests and acts taken in patient interests. See id. at 577.**3**

_____

**3** One may wonder whether the "dichotomy" identified by the Court reflected the Board's actually intended adjudicative position. The Court interpreted the Board's position as an either/or proposition: one either

11

Rebuffed in its "interest of the employer" construction, the Board remained persuaded that in faithfulness to underlying congressional policy as reflected in relevant provisions of the Act and legislative history "supervisor" must be construed in a way that did not categorically exclude LPNs from the Act's protections by virtue of their typical oversight activities in relation to CNAs. And, it properly understood Health Care not to preclude construction of other parts of § 2(11) that would have that effect. See Health Care, 511 U.S. at 583-84 (noting that decision concerned only "interest of the employer" requirement).

Accordingly, in these and comparable post-Health Care LPN-as-supervisor cases around the circuits, the Board now has taken the alternative adjudicative position that the supervisory authority typically exercised by LPNs over CNAs is not exercised with "independent judgment" as contemplated by § 2(11). Specifically, the Board has taken the position that the judgment exercised by LPNs in exercising their incidental[4] supervisory authority over CNAs is not the "independent judgment" concerned with management prerogatives that is contemplated by § 2(11), but is more properly viewed as "pro-

_____

acts in the employer's interest or in the customer/client/patient's interest. That is not only a "false" dichotomy but so clear a loser that it is difficult to believe it was what the Board actually intended. Nevertheless, it is what the Court (understandably) perceived. Perhaps, as its later adjudicative positions seem to suggest, the Board's intended distinction was between supervisory activities aimed simply at getting the health care job done in ways not inimical to basic labor-relations interests of the CNAs, and supervisory activities involving basic "management prerogatives" likely to be at odds with CNA interests, i.e. , "in the employer's interest" as opposed to theirs.

I mention this only as it may bear upon the rationality of the Board's various efforts to construe, as a matter of delegated policy choice, this and other ambiguous elements of the § 2(11) definition of "supervisor."

[4] In the typical pattern of LPN charge-nurse activities revealed in these cases, they spend the vast majority of their time on duty doing exactly what the CNAs do--directly attending to patients' basic medical and personal hygiene needs. (See J.A. 179 (Decision and Direction of Election in Carter Hall) ("85% of their workday"); id. at 462 (Decision and Direction of Election in Glasgow) ("significant amount of their time").)

12

fessional judgment" exercised in getting their assigned work done with the assistance of CNAs employed specifically for that purpose. Obviously (though not always expressly) applying such a construction of the term, the Board in recent cases consistently has upheld ALJ findings that the traditional pattern of LPN charge-nurse supervisory activities vis-a-vis CNAs exemplified in Glasgow and Carter Hall fall on the "routine or clerical" side rather than the "independent judgment" side. See supra note 1 (citing cases). As indicated, it is unassailable that if that construction is a valid one, the Board's findings in applying it in these cases must be upheld as supported by substantial evidence.

We owe that construction deference unless we can declare it "arbitrary [or] capricious" within the meaning of the Administrative Procedure Act ("APA"). See 5 U.S.C. § 706. And, more particularly, we owe it deference as a classic example of agency construction of an ambiguous provision, see Health Care, 511 U.S. at 579 (so characterizing "independent judgment"), of a statute with whose enforcement the agency is entrusted, unless we cannot say of it even that it is a "permissible construction." Chevron USA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).**5**

I do not see how the Board's construction and application of the term in these cases possibly could be declared "arbitrary [or] capricious," even were we to think it wrong-headed, or misguided, or bad statutory "interpretation," or the like. On the contrary, I am satisfied that it is easily a "permissible construction" of a definitional provision whose ambiguity--overall and in particular--bespeaks Congress's deliberate delegation to the Board of a wide range of discretion in making the difficult policy choices required to differentiate "employees" from "supervisors" at the margins in particular work-forces. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (admonishing that reviewing "court[s] may [not] displace the Board's choice between two fairly conflicting views, even though the court would

_____

**5** The Board's statutory construction by adjudication is entitled, where otherwise due, to Chevron-deference. See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 574 (1988).

13

justifiably have made a different choice had the matter been before it de novo").

The LPN charge-nurse of the pattern revealed in these cases is precisely in that marginal area. Her principal activity--the direct, hands-on care of medical patients--is the end-product of her employer's business. She does everything in the final delivery of that product that anyone in the work-force does. In that respect she is quintessentially just a member of the work-force gang--as surely as if she were on the final assembly line in a widget-producing factory.

She falls in the marginal area only because she does not act alone in the final delivery of the product. CNAs assist her in that effort, and she has and exercises some authority in assigning, directing, and monitoring their performance in giving the "aid" to her that is their function. She therefore does have some supervisory authority, and though this alone does not make her a § 2(11) supervisor, see Bell Aerospace Co., 416 U.S. at 279-83, it must of course be taken into account in determining whether she is.

Finally, there is the fact that in both her primary work activity and her incidental supervisory activity, the LPN charge-nurse functions as a "professional." This does not prevent her being found a § 2(11) supervisor nor even require that a different test of supervisor status be applied to her under § 2(11), see Health Care, 511 U.S. at 581. But, it does require that Congress's express direction that professional employees remain under the Act's organizational protections notwithstanding their "consistent exercise of discretion and judgment in [performing their work]" be also taken into account.

Given the marginal nature of the LPN charge-nurse's primary work activity and incidental supervisory function in the classic pattern of these cases, the Board's construction of "independent judgment" for application to them cannot be declared "arbitrary[or] capricious" under the APA. See 5 U.S.C. § 706. On the contrary, it is an eminently permissible construction of this ambiguous provision under Chevron. Emphasizing the incidental character of the charge-nurses' supervisory authority over CNAs in attending to a shared operational-level duty of their employment, the Board's construction simply reflects an underlying assessment that as a practical matter these LPN

14

charge-nurses are more worker--at most no more than "straw-boss" --than they are "foreman" in these health-care industry work-forces. That construction should therefore be upheld as one owed deference by this court and the findings made by the Board in applying it upheld as supported by substantial evidence.

II

As earlier asserted, the majority's contrary conclusion is reached by declining to accord the Board's decisions the deference normally commanded by APA § 706 and Chevron, instead effectively reviewing the Board's decisions de novo, both as to legal conclusions and factual findings. The majority never says that this is its process, nor even expressly acknowledges the relevance of APA§ 706 and Chevron to that process, but that this was effectively its process is evident from the analysis described in its opinion and from the result reached.

First off, the majority simply disregards the Board's construction of "independent judgment," never asking the hard questions about it that are commanded by the deferential "arbitrary or capricious" standard of APA § 706 and the "permissible construction" standard of Chevron. Instead, purporting to find in the Board's decisions on LPN supervisor status an "irrational inconsistency" that apparently disentitled its construction to any deference, the majority simply adopts de novo its own interpretation of what it seemed to treat as the term's plain statutory meaning. And the construction it adopts is one so stringent in formulation that under it all exercises of supervisory authority except those involving no discretion would appear to involve "independent" judgment. According to the majority, to exercise authority "with `independent judgment' mean[s] that it must be exercised in a non-ministerial way to achieve management goals." If "ministerial" is given its ordinary legal meaning in this construction, only supervisory activities carried out under rigidly prescribed guidelines leaving no room for discretion--that is, imposing "ministerial" duties--could be found not to involve independent judgment. See Black's Law Dictionary 996 (6th ed. 1990) (defining "ministerial duty").

Then, without any reference to the deferential review of factual findings commanded by the substantial evidence standard, see

15

Universal Camera Corp., 340 U.S. at 488, the majority describes its fact-finding review function as being to "determine whether the facts of record fulfill the statutory requirements of 'supervisor,'" which include of course the majority's construction of "independent judgment." Inevitably then, reviewing directly the "facts of record" under its own construction of "independent judgment," the majority concludes--in what has all the appearance of raw fact-findings--that the LPN charge nurses are supervisors under the NLRA.

We of course cannot know what result the majority would have come to had it carefully identified and reviewed the Board's quite different legal construction with proper deference rather than simply imposing its own much different one. Nor can we be sure that it applied the construction it posited to the "facts of record" as stringently as its literal formulation suggests it might have. We can be sure, however, of several things about the process it purported to follow.

The first is that the court properly could not simply disregard the Board's construction. That construction was entitled to recognition and deferential review as the necessary first, and likely dispositive, step in the process.**6** The next is that the majority would have faced a formidable--I think impossible--task in explaining why the Board's construction was not entitled to deference under § 706 of the APA and Chevron, even if it were thought that the majority's more stringent construction also could pass muster under those standards. The last is that the majority's construction of "independent judgment," if applied with anything approaching the stringency its "ministerial" standard suggests, would make it almost impossible ever to find any exercise of supervisory authority not one involving "independent judgment." And that is at odds with the Supreme Court's recognition that not all exercises of supervisory authority need be found by

---

**6** A recent Supreme Court decision provides an object lesson in the judicial obligation to recognize and accord deferential review to even facially counterintuitive Board rules as the necessary first step in the "arbitrary [or] capricious" review commanded by APA § 706. See Allentown Mack Sales & Service, Inc., 116 S. Ct. 818, 821-23 (1998) (finding on basis of rigorous, pragmatic review of "puzzling policy" of Board rule, that it was not, however, "arbitrary[or] capricious").

16

the Board to make one a § 2(11) supervisor. See Bell Aerospace, 416 U.S. at 279-83.

This refusal to accord normal deference to the Board's construction of "independent judgment" not only leads to what I believe are wrong results in these cases, it creates bad and troublesome precedent for future NLRB (and general agency) review in this circuit. Because of the latter consequence, I believe it important to point out wherein I think the majority strays from proper administrative agency review principles.

Consider first the authority relied upon by the majority for the clearly implied proposition that a course of inconsistency in Board decisions on a particular issue bespeaks "policy bias" which then dis- entitles later Board decisions on that issue to normal deference by rea- son of the demonstrated irrationality of the Board's legal position. Asserting that the Board's recent "shift [of] . . . position" on LPN- supervisor status "has prompted widespread speculation that the Board's decisions on this subject are based not on the [the Act's defi- nition of supervisor) but on a `policy bias'," the majority cites in sup- port of that ominous suggestion four judicial decisions: that of the Supreme Court in Health Care; that of the Sixth Circuit in Caremore, Inc. v. NLRB, 129 F.3d 365 (6th Cir. 1997); and two of this court in, respectively, NLRB v. St. Mary's Home, Inc., 690 F.2d 1062 (4th Cir. 1982), and Glenmark Associates, Inc. v. NLRB, 147 F.3d 333 (4th Cir. 1998). But none of those decisions, including those of this court in St. Mary's and Glenmark, provides valid support for the assertion.

In the passage quoted from Health Care, the Supreme Court is not adverting to any inconsistency of results in a series of Board decisions on LPN charge-nurse status, but simply to the "inconsistency" of the Board's construction of "in the employer's interest" with the statutory language and Court precedent in the very case before the Court. Simi- larly, the Court's reference to a "shift [of] ground" in the Board's position has not to do with any inconsistency of Board decisions, but only with a "shift" by the Board from reliance on statutory construc- tion to non-statutory arguments in the very case before the Court. See Health Care, 511 U.S. at 580. Health Care is not, therefore, about forfeited deference because of a course of inconsistent Board deci-

17

sions, but about perceived error of statutory construction in the case at hand under normal standards of agency review.

Neither, in the passage cited from Caremore, is the Sixth Circuit adverting to a series of inconsistent prior Board LPN-as-supervisor decisions. Instead, the court is faulting a Board refusal in the very case before the court to follow what the court considers settled circuit law on LPN supervisor status. See Caremore, 129 F.3d at 370-71. Neither, therefore, is Caremore a decision about forfeited deference by reason of previous inconsistency of decisions, but simply about what the court considers to be defiance of settled circuit law in the very case before it.

When we turn to the two decisions of this court on which the majority relies for the proposition, we do find the proposition asserted but not, I am satisfied, with any authority or valid basis in administrative law. The proposition first appears in the 1982 split panel decision in St. Mary's Home. There, after reciting the Universal Camera maxim that under the "substantial evidence" standard Board orders may be denied enforcement when the reviewing court is unable on the basis of the whole record to find a Board decision supported by substantial evidence, the majority opined:

> [T]his should be particularly true when the Board is determining supervisory status because of the inconsistency in the Board's application of the statutory definition and of the factors to be used in determining such application. So manifest has this inconsistency been that a commentator recently has aptly observed that "the Board has [so] inconsistently applied the [statutory] definition" of supervisor as to cause one necessarily to speculate "that the pattern[of Board decisions on supervisory status] displays an institutional or policy bias on the part of the Board's employees" as illustrated by a practice of adopting that "definition of supervisor that most widens the coverage of the Act, the definition that maximizes both the number of unfair labor practice findings it makes and the number of unions it certifies." Note, The NLRB and Supervisory Status: An Explanation of Inconsistent Results, 94 Harv. L. Rev. 1713 at 1713-14 and 1721

18

(1981). For this reason, courts must carefully scrutinize the Board's findings and the record on supervisory status.**7**

St. Mary's Home, 690 F.2d at 1067.

The majority opinion in Glenmark, a later split panel decision on LPN supervisory status, then simply picked up on the St. Mary's Home observations in the course of a lengthy footnote devoted to reviewing and criticizing the Board's LPN-as-supervisor decisions. See Glenmark, 147 F.3d at 339 n.8.**8** Glenmark drew on no other authority than St. Mary's Home for the proposition that inconsistency of prior decisions reveals a policy bias that disentitles a Board deci- sion under current review to normal deference.

It thus appears that the majority's no-deference position in these cases simply emerged out of whole cloth in the St. Mary's Home court's assumption that the Board's inconsistency on the subject of

_____

**7** In this last quoted sentence, St. Mary's Home expressly adopted a review standard facially less deferential than that normally commanded on the basis that inconsistency bespeaking "policy bias" had been dem- onstrated to the court's satisfaction. For whatever reason, the majority here does not expressly invoke that critical aspect of the St. Mary's Home decision, but obviously makes the same assumption: that inconsis- tency bespeaking policy bias diminishes (or completely abolishes) the deference ordinarily commanded in agency review.

**8** Several passages in that footnote bear noting as indications of the extent to which the Glenmark court's assumption of Board "policy bias" necessarily influenced the deference with which it reviewed the Board's decision in that case. The note opens with the observation that "This issue of the supervisory status of nurses serves as another example of the NLRB's continuing effort to modify the plain language of § 2(11)." Id. (emphasis added). Later, the Board's post-Health Care construction of "independent judgment" is characterized as an adversarial litigation posi- tion taken when the Board "began this latest litigation--attacking the supervisory status of nurses." Id. (emphasis added). And later there appears the suggestion that "[c]redibility is as important to an agency appearing before us as it is to any other litigant", id. (emphasis added), followed by citations to several recent decisions of this court, all since 1997, in which the court is said to have "criticized the Board's question- able positions," hence, presumably, its "credibility" as a "litigant." Id.

19

LPN supervisor status revealed a "policy bias" that warranted the position. I do not believe the position has any support in settled administrative law nor--for what it is worth--in the Harvard Law Review Note on whose assumptions of inconsistency and, from that, of "policy bias," the St. Mary's Home court drew. Accordingly, I would take the occasion of this en banc rehearing to pull back from any implication from St. Mary's Home and Glenmark that as a general proposition NLRB decisions on supervisor status in general or LPN supervisor-status in particular are not entitled to the normal deference commanded by 5 U.S.C. § 706 and Chevron .

Take first the assumption of inconsistency of prior decisions on which the further assumption of pro-union policy bias is rested. The only "inconsistency" of which I am aware that is generally understood in administrative law to warrant a withholding of normal deference is that involving an unexplained shift of position on the very issue under review. See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973); see generally Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 11.5 at 206 (1994) ("The dominant law clearly is that an agency must either follow its own precedents or explain why it departs from them.").

In the cases we review, the Board's construction of "independent judgment" involved no such unexplained change of position. As indicated, neither Health Care nor Caremore had held that the Board's LPN-as-supervisor decisions involved such an unexplained change of position. And when one looks independently at the course of Board decisions on the subject, they do not. The only shift in legal position involved in those decisions was from rejected reliance on "interest of the employer" to reliance on "independent judgment" as the element lacking in the "supervisor" definition. To shift positions between alternative grounds for decision (here, alternative grounds of statutory construction) is a time-honored practice in the decisional process, and that one here was adequately explained in the Board's post-Health Care decisions.[9]

_____

[9] Incidentally, the "inconsistency" identified in the Harvard Law Review Note relied upon in St. Mary's Home was not this sort of shift-of-position inconsistency, but a perceived inconsistency between the

20

To the extent that the majority relies on the St. Mary's Home court's assumption of Board "policy bias" as an independent basis for withholding deference, I do not believe that any accepted principle of administrative law authorizes a judicial refusal to apply normal standards of agency review as a means of countering assumed agency bias. The majority cites no authority to that effect other than that asserted in our St. Mary's Home and Glenmark decisions. The most relevant Supreme Court authority on the general subject actually points in the other direction: requiring that courts accept and accommodate the reality that agencies must be able to adopt policies reflecting ideological policy "biases" of the currently sitting administration. See Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696 (1991) (emphasizing necessity that deference be so informed). As the Court put the point in Chevron:

> While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices--resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

Chevron, 467 U.S. at 865-66; see also Blackburn v. Reich, 79 F.3d 1375, 1382 (4th Cir. 1996) (Williams, J., dissenting) (observing that because of the deference owed agency interpretations based on policy

_____

Board's construction of "supervisor" in "bargaining unit" cases (such as those before us) and its construction in "unfair labor practice" cases (such as that in St. Mary's Home). The note author suggested that this inconsistency's explanation lay in the fact that the Board's (ironically) consistent pattern of decisions in each of the two categories, though inconsistent with each other, both yielded pro-union or pro-labor results. See 94 Harv. L. Rev. at 1718-21. Interestingly, to the extent the Note has any relevance for our purposes, the author's suggested remedy for that inconsistency was not any judicial or statutory alteration of the normal standard of judicial review, which was positively rejected as a proper remedy, but a cessation of using the § 2(11) definition of "supervisor" in certain "unfair labor practice" cases, where it was suggested that common law agency rules should apply. Id. at 1728-31.

21

considerations of the elected branches, "`federal judges--who have no constituency--have a duty to respect legitimate policy choices made by those who do'") (quoting <u>Chevron</u>, 467 U.S. at 866).

Common sense and logic point in the same direction. Only uncontrollable mischief can result from courts presuming, on the basis of some perceived policy bias in a course of agency decisions, to confer a general pariah status upon that agency. How long would it persist? Must reinstatement be somehow "earned" by the agency to entitle it once again to normally deferential review? How, as a practical--and legally enforceable--matter could it be "earned?" Would not any deliberate attempt to do so necessarily compromise the integrity of the agency's quasi-judicial function?

More critically, the normal standards of review, evenly applied case-by-case, are as adequate to correct error induced by "policy bias" as by any other cause. Put otherwise, only policy bias that induces error detectible under normal review standards--arbitrary or capricious legal conclusions or findings not supported by substantial evidence--are, and need be, of any concern to reviewing courts. Any bias having that effect will adequately reveal itself in even-handed applications of the normal standards. <u>Cf. NLRB v. Pittsburgh Steamship Co.</u>, 337 U.S. 656, 659-60 (1948) (holding, in rejecting contention that Board findings must be rejected because of revealed ALJ bias, that courts could properly reject only those findings that carried their "own death wound" by reason of decisional bias).

In sum, I think there is no authority in settled administrative law nor basis in sound administrative law principles for the majority's apparent belief that courts may disregard normal standards of deferential agency review whenever a course of agency decisions persuades them of agency policy bias on a matter at issue. In relying upon <u>St. Mary's Home</u> and <u>Glenmark</u> in which that position is flatly adopted and applied in review of Board decisions, the majority perpetuates bad precedent for this circuit.**10** Judge Murnaghan, Judge Ervin, Judge Michael and Judge Motz join in this dissent.

_____

**10** Because I would uphold the Board's determination that the LPN charge-nurses in these cases are not § 2(11) supervisors, I would also have to address the contention that in refusing to allow cross-examination of union members respecting their pro-union bias, the Board denied the employers due process. I would reject that contention for reasons given in Judge Hall's vacated panel opinion in <u>Glasgow</u>. <u>See</u> <u>Glasgow</u>, 136 F.3d at 360-61.

22